**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| PAMELA K. HARTNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-17–HEH |
| | ) | |
| CHARLES VANEVERA | ) | |
| HARDENBERGH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**
**(Granting in Part and Denying in Part
Defendants' Motion to Dismiss)**

This matter is before the Court on Defendants'[1] Motion to Dismiss Amended

Complaint (the "Motion," ECF No. 24), filed on March 30, 2023. On February 17, 2023,

Plaintiff Pamela K. Hartnett ("Hartnett" or "Plaintiff") filed a five-count Amended

Complaint, asserting claims of assault and battery, defamation, negligence, gross

negligence, willful and wanton negligence, trespass, and malicious prosecution. (Am.

Compl. at ¶¶ 88–139.) Defendants seek to dismiss Plaintiff's Amended Complaint

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. at 1.)

The parties have filed memoranda supporting their respective positions, and oral

argument was heard on June 20, 2023. For the foregoing reasons, Defendants' Motion

---

[1] Defendants include: Charles Vanevera Hardenbergh ("Van"); Mari Liza Hardenbergh ("Mari");
Israel De La Cruz ("Mr. De La Cruz"); Charles V. Hardenbergh, PC; Commonwealth Attorney
Marketing Service, LLC; The Monroe Building, LLC; and 135 Monroe, LLC (collectively,
"Defendants"). (Am. Compl. at 1, ECF No. 9.)

will be granted in part and denied in part.

## I.   BACKGROUND

Hartnett has been a longtime resident of Petersburg, Virginia, but now resides in Littleton, North Carolina.  (Am. Compl. ¶ 20.)  Van is a Petersburg, Virginia, resident and a Virginia licensed attorney.[2]  (*Id.* ¶ 8.)  Mari is Van's wife, and Mr. De La Cruz is Mari's brother, who also lives in the Hardenberghs' household.  (*Id.*)  Van operates law offices in both Petersburg and Lexington, Virginia.  (*Id.*)  In February 2017, Van employed Plaintiff to be a driver for him in his law practice and to work for the Hardenberghs' private charity.[3]  (*Id.* ¶¶ 20–21.)  During this time, Hartnett and the Hardenberghs were also neighbors as they lived "less than two blocks away from each other," and often visited with each other.  (*Id.* ¶ 23.)

---

[2] To clarify, in addition to his law practice, Van owns and controls multiple business entities, which are also named as Defendants in this case.  Defendant Charles V. Hardenbergh, PC, is a Virginia professional corporation and is owned/controlled by Van with its principal office located in Lexington, Virginia.  (Am. Compl. ¶ 12.)  Defendant Commonwealth Attorney Marketing Service, LLC, is a Virginia limited liability company and is owned/controlled by the Hardenberghs, with Van as its registered agent and its principal office also located in Lexington, Virginia.  (*Id.* ¶ 13.)  Defendant The Monroe Building, LLC, is a Virginia limited liability company located in Petersburg, Virginia, and is also owned/controlled by Van.  (*Id.* ¶ 14.)  Defendant 135 Monroe, LLC, is another Virginia limited liability company that is owned/controlled by the Hardenberghs, with Van listed as its registered agent and its location also in Petersburg, Virginia, next door to The Monroe Building, LLC.  (*Id.* ¶ 15.)  These Defendants will hereinafter be referred to as the "Corporate Defendants."

[3] The charity organization, named "RockBandVan," owns a limousine-type motor vehicle, which is used for the charity, but is also personally used by the Hardenberghs and is usually driven by a chauffeur.

## A. The Hardenberghs' Alleged Assault and Battery of Plaintiff

On July 20, 2019, Hartnett and the Hardenberghs were driven in the Hardenberghs' charity limo by a chauffeur to a dinner at Bookbinders in the City of Richmond. (*Id.* ¶ 24.) This was followed by a charity event which was held at the Hippodrome also located in Richmond, after which they were driven back to their homes in Petersburg. (*Id.*) Both Hartnett and the Hardenberghs consumed alcohol at various times throughout the evening. (*Id.* ¶ 25.)

On their return trip to Petersburg, the Hardenberghs were sitting together in the back of the limo in the captains' chairs, and Hartnett was sitting across from them on the opposite bench. (*Id.* ¶ 26.) All were conversing with each other. (*Id.*) Allegedly, part of this conversation included Mari complaining to Van that Hartnett's photos of her, which were used for the Hardenberghs' charity, did not depict Mari "in the best way." (*Id.* ¶ 27.) Van then responded sympathetically to his wife's complaints and turned to Hartnett and asked, "Ah, how is my Pammie?" (*Id.* ¶ 28.) This led Hartnett to tell the Hardenberghs "I am done with both of you." (*Id.* ¶ 29.)

Plaintiff alleges that suddenly and without warning, Van jumped out of his chair in the limo, pushed Hartnett down and off the bench, and beat her repeatedly in the face. (*Id.* ¶ 30.) In doing so, Van placed pillows over Hartnett's head and held her down while Mari then "began to severely beat upon Hartnett's face, head and body for what seemed like a long time." (*Id.* ¶ 30.) The altercation came to an end when the limo arrived at the Hardenberghs' home in Petersburg. (*Id.* ¶ 30.)

3

At that time, Hartnett, "bloodied, beaten, and in shock," quickly exited the charity

limo and walked toward her home. (Am. Compl. ¶ 31.)  The Hardenberghs also exited

the limo in front of their home. (*Id.* ¶ 32.)  As Hartnett was approaching her home's front

door, the limo driver allegedly pulled up and asked her if she was ok. (*Id.* ¶ 33.)  Hartnett

then entered her home and locked her doors. (*Id.* ¶ 34.)

Once inside her home, she took photographs of her face injuries. (*See* Ex. 2 to

Am. Compl. at 1–2, ECF No. 9-2.)  Shortly after being home, Mari came to Hartnett's

front door to retrieve her dog, who Hartnett had been caring for, and Hartnett responded,

"that she was calling the police and [Mari] could not have the dog." (Am. Compl. ¶ 36.)

After Mari left Hartnett's home, Van appeared at Hartnett's front door. (*Id.* ¶ 37.)

Hartnett refused to let him in, telling him that "she was calling the police." (*Id.*)  Van

then allegedly went around to the back of Hartnett's home and came in through the back

door, which she believes he accessed using a key. (*Id.* ¶ 38.)  Hartnett claims that she

"feared for her life" and attempted to dial 911, however, her phone's battery was dead.

(*Id.* ¶ 39.)

Hartnett then went upstairs to her bedroom to call 911 on her landline phone,

however, she was followed by Van, who quickly interrupted her call by hanging up the

phone. (*Id.* ¶ 40.)  She alleges that Van again began to physically assault and batter her

in her bedroom. (*Id.*)  Fearing for her life, Hartnett attempted to "free herself by going

into a nearby sitting room." (*Id.* ¶ 41.)  However, Van followed her and continued to beat

her. (*Id.*)  Hartnett tried to escape out to an adjoining upstairs deck, where she allegedly

began screaming for help, however, Van then grabbed her and threw her back into the room on a sofa. (Am. Compl. ¶ 42.) As Van continued to beat Hartnett, she kept trying to move away from him, but she could not escape. (*Id.*) During the alleged assault, Van broke a television and table in the room. (*See* Ex. 3 to Am. Compl. at 1, ECF No. 9-3.)

At this point, Hartnett realized that Mari had returned to Hartnett's home and was upstairs, just outside the same room, filming Van beating Hartnett. (Am. Compl. ¶ 43.) Mari then allegedly took Hartnett's "iPhone, iPad, and security cameras from inside the home." (*Id.* ¶ 44.) Eventually, Van told Hartnett she needed her face washed and that he wanted to take her into the bathroom to do so. (*Id.* ¶ 45.) Allegedly in a state of "shock and confusion," Hartnett replied, "[i]f Mari leaves, I will let you wash my face." (*Id.* ¶ 45.) At that time, Mari stated, "I got what I came for," and left. (*Id.*)

Shortly thereafter, Hartnett alleges that she was lying on her bed "barely conscious, in shock, and in great pain with blood on her face and body," eventually losing consciousness. (*Id.* ¶ 46.) In order to wash her face, Hartnett alleges Van pulled her off her bed, "hitting her body on the floor," and pulled her across the floor to the bathroom where he attempted to wash her face. (*Id.*) Hartnett claims that at this point she was unable to do anything herself and "against her will, [Van] undressed [her] and placed her in the bed sometime after 4:00 a.m." (*Id.* ¶ 47.) Hartnett alleges she was barely conscious but believes Van left the home after she was placed in her bed. (*Id.*)

In the early morning hours of July 21, 2019, Van again came unannounced into Hartnett's home, waking her up and "pleading with her saying he was sorry as he was

crying." (*Id.* ¶ 48.) At that time, Van told Hartnett she needed a shower, and he then put her in the shower and bathed her "while she just stood there in fear and shock." (Am. Compl. ¶ 48.)

After the shower, Van stayed in Hartnett's bedroom and wrote a list regarding his relationship with Hartnett which stated: "I am grateful for: 1.) My trusted friend Pam and her love 2.) Our girls 3.) Every memory of Pam smiling at me 4.) When we can be happy and sit on the beach[] 5.) Mike's daughter." (Ex. 4 to Am. Compl. at 1, ECF No. 9-4.) Van left this note on Hartnett's night stand next to her bed. (Am. Compl. ¶ 49.) Hartnett eventually took several more photographs of her injuries. (Ex. 5 to Am. Compl. at 1–26, ECF No. 9-5.)

Later that day, Van contacted Hartnett by text message, asking her, "Are you ok?" (Ex. 6 to Am. Compl. at 1, ECF No. 9-6.) Hartnett responded: "Van, right now I don't know what ok is." (*Id.*) Van then responded: "I know the feeling. I have been turned inside out and upside down. I love you Pammie and I am so sorry we fought. Mari is packing me up to go to Lexington. I hope you will come with me." (*Id.* at 1–2.) Van allegedly went on to explain that he wanted to leave early for Lexington for a court matter, two days prior to the originally scheduled date, and begged Hartnett to come with him. (Am. Compl. ¶ 51.) "Still very much in shock and physically and emotionally traumatized due to the severe beating she received by the Hardenberghs," Hartnett responded that she could not think about doing that or any packing. (*Id.*)

Sometime after, Hartnett claims that the Hardenberghs came to her home

unannounced. (*Id.* ¶ 52.) The Hardenberghs then "used extreme pressure on [her] to force her to go to Lexington with [Van] against her will." (Am. Compl. ¶ 52.) She claims she was still in shock and very much traumatized by the Hardenberghs beating her. (*Id.*) While Van packed Hartnett's clothes, Mari specifically apologized to Hartnett "for beating her . . . and tried to hug her, which Hartnett rebuffed." (*Id.* ¶ 53.) Van then began to drive Hartnett and himself in his personal vehicle to the Hardenberghs' home in Lexington. (*Id.* ¶ 54.)

Once in Lexington, Hartnett was left in the Hardenberghs' home alone while Van attended his law office, leaving her with no transportation. (*Id.* ¶ 55.) Hartnett remained in the Hardenberghs' home "against her will for five days during which time she asked Van numerous times if he would take her home, but he declined and said not yet, 'your face looks horrible.'" (*Id.* ¶ 56.)

Finally, as Van had a court appearance in Hanover County, he loaded up Hartnett's belongings, and Hartnett drove Van to the Hanover County Court Complex "where [Van] instructed [her] to park far away from the building so no one would see her and to wait for him." (*Id.* ¶ 57.) After his court appearance, Van returned to the car, and Hartnett drove them to their homes in Petersburg. (*Id.*)

### B. Hartnett's Criminal Allegations Against the Hardenberghs

Later in the evening of July 25, 2019, Hartnett, "with her own legal assistance, reported in a sworn statement the Hardenberghs' criminal actions to the local law magistrate's office." (*Id.* ¶ 58.) This resulted in the issuance of criminal warrants against

the Hardenberghs for malicious wounding, abduction by force/intimidation, entering her house to commit assault and battery, damage phone line, destruction of property, and grand larceny. (Am. Compl. ¶ 58.) At this time, Hartnett also obtained an emergency protective order against the Hardenberghs. (*See* Criminal Compl. at 1, Ex. 7 to Am. Compl., ECF No. 9-7.)

The Hardenberghs were thereafter served with the criminal warrants, and Van and Mari both retained separate legal counsel. (Am. Compl. ¶ 59.) Due to conflicts with the Petersburg Commonwealth's Attorney Office, the Commonwealth Attorney moved for the appointment of Richard K. Newman ("Newman") as Special Prosecutor. (*Id.* ¶ 60.)

Allegedly thereafter, the "criminal warrants against the Hardenberghs were *nolle prossed* by Newman . . . on November 18, 2019, which Hartnett opposed." (*Id.* ¶ 61.) Hartnett again obtained criminal warrants, and they were again *nolle prossed* by Newman on December 16, 2019, which Hartnett again opposed. (*Id.* ¶ 62.) On or about January 8, 2020, after Hartnett's "continued efforts to seek justice," Newman sought and obtained from a local multi-jurisdictional grand jury in the Circuit Court of Colonial Heights the issuance of multiple criminal indictments for felonies and misdemeanors against the Hardenberghs. (*Id.* ¶ 63.) Due to delays caused by the COVID-19 pandemic, trials were finally set in the Petersburg Circuit Court for the Hardenberghs, with a January 2022 trial set for Mari and a March 2022 trial for Van. (*Id.* ¶ 64.)

Hartnett, along with her counsel, met on or about June 25, 2021, with Kurt D.

Lockwood ("Lockwood"), Newman's Assistant Commonwealth Attorney.[4] (Am. Compl. ¶ 65.) The meeting allegedly lasted for nearly two hours and ended with "Hartnett and her counsel given assurances by Lockwood that the criminal matter against the Hardenberghs was going to trial." (*Id.*)

However, without consulting Hartnett beforehand, Newman advised defense counsel, Hartnett, and her counsel by email that he intended to place the Hardenberghs' criminal matter on the circuit court's docket for January 6, 2022. (*Id.* ¶ 66.) Newman stated that "prior to that date the Hardenberghs [were] to have paid [Virginia Department of Criminal Justice ("DCJS")] in full as to the amounts that have been disbursed to [] Hartnett due to treatment received." (*Id.*) He further stated, "[b]oth [Hardenberghs] should be enrolled in anger management classes. They will be ordered by the Court to complete those classes. If both of these matters are done by that date I will take a *nolle prosequi* of the charges." (*See* Newman's Email, Ex. 8 to Am. Compl., ECF No. 9-8.)

On January 6, 2022, the circuit court granted the *nolle prosequi* motions, and they were entered on January 20, 2022. (Am. Compl. ¶ 67.) However, those orders did not have the conditions of payments to DCJS or anything about anger management classes as stated by Newman. (*Id.*; *see also* Petersburg Circuit Court Order at 1–2, ECF No. 9-9.)

---

[4] Newman had previously advised Hartnett's counsel that Lockwood would be handling Hartnett's case. (Am. Compl. ¶ 65.)

### C. The Hardenberghs' Alleged Defamation Campaign Against Hartnett

After the entry of the circuit court's orders regarding the *nolle prosequi* motions,

the Hardenberghs allegedly began a campaign of defaming Hartnett on Facebook, "to

cover up and deflect their known criminal guilt." (Am. Compl. ¶ 68.) The Hardenberghs

allegedly posted the following false and defamatory statements about Hartnett by

referring to her as "Pam H," or "Pam 🥜" [5] and "stating, inferring, and implying" she

committed criminal acts and lied about the Hardenberghs' criminal acts:

> On March 17, 2022, at 8:36 a.m., Van posted:
>
> THE THING ABOUT PAM. . .
>
> If y'all haven't seen this fascinating new series about a CRAZY Pam, it is
> riveting. Pam appears to be a pillar of the community, but underneath it she
> is a lying sociopath who ingratiates herself and tries to make herself part of
> the victim's family. The similarities between the real-life Pam H and our
> own local crackpot Pam H are eerily uncanny. Motivated by greed and a
> desire for control over others, both seek to constantly undermine people by
> lying and seeking to cast blame on innocent victims after perpetrating
> unthinkable crimes against them. They give Pams a bad name!! You will
> definitely get a blast out of this excellent drama based on real life . . .

(*Id.*)

Hartnett alleges this post compares her with Pam Hupp,[6] "a murderer." (*Id.*)

Hartnett also asserts that Van testified that he was thinking of Hartnett when he wrote

"our own local crackpot Pam H." (*See Hardenbergh v. Thorsen, et al.*, Hr'g Tr. at 96:10–

---

[5] This moniker consists of a heart and peanut emoji, to refer to Hartnett as "Heart-nut." Van later
testified that he was referring to Hartnett in the use of the emojis.

[6] Pam Hupp is a convicted murderer, who is currently serving a life sentence in Missouri and
who is portrayed in the Netflix show "The Thing About Pam."

97:03 [hereinafter "Hr'g Tr."], ECF No. 9-12.)  Van also testified that this post, and

others, were likely written by several individuals, allegedly including himself, Mari, and

Mr. De La Cruz, among others.  (*See id.* at 97:04–98:08.)  Further, in response to a

Facebook comment on the previous post stating, "So, this is an accurate portrayal of

'that' Pam??? Lol," Van stated:

> I couldn't say how accurate it is.  Some folks who lived in the location where
> Pam Hupp committed her crimes have commented in an online fan forum
> that the characters are EXACTLY like their real-life counterparts.  I can say
> that the similarities between this disturbed bird and our real-life Pam H here
> in Petersburg are numerous.  Both are accomplished liars who are completely
> self-centered, manipulative, and dangerous parasites.  More to come . . . .

(Am. Compl. ¶ 68.)  Hartnett asserts that this post alleges she is an "accomplished

liar" among other defamatory comments.  (*Id.* ¶ 68.)

On March 19, 2022, Mari posted, and Van reposted,[7] "We never regret

being kind to the wrong people because the wrong people are often the victims of

liars.  But our specialty is uncovering the truth.  So if you've been the victim of a

con artist, call us at 1-866-Van-Wins and we will fight for you!

#TheThingAboutPam."  (*Id.*)  Hartnett alleges this post implies that she is a liar

and a con artist.  (*Id.*)

On March 29, 2022, Mari posted:

What's Pam's Problem???

---

[7] When a post is reposted on Facebook, the original user's post is displayed in its entirety on the reposter's Facebook page.

It's Pam Day!!!  That's the day the latest episode of The Thing About Pam is released.  Before we try to figure out what makes Pam so crazy, let's look at the Top Ten Things Pam Hupp has in common with Petersburg's own notorious Pam 💙 ¡another known con artist with sociopathic tendencies, primarily lying – first and foremost she is a shameless liar who is fundamentally dishonest and treacherous. . . .

1. Greed – Both had the same motivation for their crimes – to get money.
2. Strict Catholic Upbringing – They were raised in the church and act pious.
3. Violence – Both commit violent crimes, claiming their victims are to blame.
4. False Witness Against Thy Neighbor – Knowingly blaming innocent people.
5. Fired for Dishonesty – One for forging signatures, the other for embezzling.
6. Constantly Ingratiating Themselves – Wanting to be part of victims' family.
7. Relationship Status: Fail – One is twice divorced, one never got a proposal.
8. Next to the youngest – Both were born next to last in large families (4 & 7).
9. Inheritance – Greed strong enough to exclude siblings from a parent's estate.
10. Imposters – Both claimed in communications to be someone else.  They lied.

(Am. Compl. ¶ 68.)  Hartnett alleges that this post again likened her "with murderer Pam Hupp and falsely alleged, in part, that Hartnett is a sociopath, liar, committed violent crimes, and embezzled from her employer." (Am. Compl. ¶ 68.)  Van testified that he was thinking of Hartnett when he wrote "Pam 💙 ¡." (*See* Hr'g Tr. 85:20–86:05.)  He also testified that this post was likely written by several individuals, including himself, Mari, Mr. De La Cruz, among others. (*See id.* 94:18–95:15.)

Later, that same day, Mari reposted Van's post, and added: "Pam 💚✨ ⁱis a

shameless liar who is fundamentally dishonest and treacherous . . . ," with three

photos of Pam Hupp.  (Am. Compl. ¶ 68.)

On April 2, 2022, Mari stated, "It's the City's fourth homicide this year and

we have LIARS in the world like Pam 💚✨ ⁱwasting law enforcement's time and

resources. #pathetic."  (*Id.*)

On April 7, 2022, Van posted:

SHOULD WOMEN WHO LIE FACE CONSEQUENCES?

History is full of men and women who made false accusations against others.
The recent smash hit The Thing About Pam illustrates a prime example.  In
our hometown it is a particularly fascinating phenomenon because of the
striking similarities between the protagonist and our own disturbed dingbat,
Pam 💚✨ ⁱ . . .

What motivated them?  In both cases, old fashioned greed.  Both Pams are
courtroom veterans who have plotted and schemed to get money via fixed
verdicts and shady claims.

Who made them that way?  It seems that both grew up at the hands of an
abusive parent.  Both struggled with their weight.  Both got the bulk of their
assets from the death of someone close to them.  Both pretended falsely to
be the victim when in fact they were the perpetrator.

But there were also differences.  One is a mother of two, the other an old
maid, a crone.  One is from the Midwest, the other born and raised right here
in Petersburg.  While the two aren't exactly identical, what they have in
common is truly apparent from the beginning.  If you haven't seen it, this is
TOP quality binge watching material.  The final episode comes out next
week, stay tuned!!!

(*Id.*)

13

Hartnett alleges once again that Van compared her to "murderer Pam Hupp" and falsely claimed that Hartnett "plotted and schemed to get money via fixed verdicts and shady claims." (*Id.*)

On April 13, 2022, Van posted, and Mari reposted, in part, the following post:

Too many BS crimes that waste their time, a prime example being Petersburg's notorious Pam 💚✔️ ᶦwho fabricated fantastic claims against Mrs[.] Fabulous and Yours Truly, charging us with preposterous counts of abduction, breaking and entering, assault, etc. Even after the charges were dismissed 3 times by 3 different judges, this woman STILL tried to get the Magistrate to let her swear out the charges again. When they refused, she slithered right over to the Police Department to see if perhaps they might receive her entreaties a bit more warmly.

No dice. The by now long worn-out victim act was of no further use. But y'all know that a leopard doesn't change its spots, right? Not to worry my friends, the story isn't over yet. In fact, it's only just beginning!!!

Although I would LOVE to disclose ALL of the JUICY DETAILS and SALACIOUS GOSSIP that people have shared with us, the time has not quite yet come for the big reveal(s). But what I can tell you is this: witnesses have stated that Pam has a lifelong pattern of trying to break up couples. She ingratiates herself and seems like a bosom buddy at first, but it's a long con that unfolds treacherously over time. More details on her MO and past victims to come.

For now, all I can confirm is that PART of the problem here in Petersburg is created by false claims that are composed of nothing but lies. The liars who perpetrate these frauds are just like Pam Hupp and Pam 💚✔️ ᶦsociopaths who love to scheme and scam, wasting the time of police officers and attempting to frame completely innocent people as part of a greedy grifter's game of larcenous betrayal. Stay tuned ya'll . . .

(*Id.*)

14

Hartnett asserts that this post falsely alleged she "lied to police about her claims against Defendants, tries to break up couples, and is a sociopath akin to murderer Pam Hupp." (*Id.*)

Hartnett contends that these posts and statements made by the Hardenberghs, and possibly others, about her are false and defamatory as they "state, infer, and imply" that she "lied and/or fabricated her allegations against the Hardenberghs . . . ;" she is a "sociopath" or "mentally deranged"; she committed "violent criminal acts;" she "embezzled from her employer;" and she tried to "get money via fixed verdicts and shady claims." (Am. Compl. ¶ 69.) Van testified that the Hardernbergs made these Facebook posts to entice Hartnett into reacting and doing something against her own interest. (*See* Hr'g Tr. at 98:14–101:22.)

During late March and April 2022, Hartnett alleges that the "Hardenberghs and/or employees or agents of Defendants authorized, prepared, and/or publicly displayed" a large sign on the east side of Van's law office. (Am. Compl. ¶ 70.) The sign stated, "The Law Offices of Charles V. Hardenbergh proudly protect and defend the victims of Registered Sex Offenders, Extortionists, Liars, and Violence." (*See* Ex. 11 to Am. Compl. at 1, ECF No. 9-11.) The sign includes three large photos of Hartnett and one photo of her attorney; however, their eyes are blacked out. (*Id.*) Hartnett alleges that this post is defamatory as it labels and allows people to infer that she is a registered sex offender, extortionist, liar, and violent. (Am. Compl. ¶ 71.)

15

### D. The Hardenberghs' Alleged Criminal and Civil Malicious Prosecution of Hartnett

On or about May 3, 2022, Van attempted to file criminal charges against Hartnett in the Magistrate's Office of the City of Petersburg, which the Magistrate refused. (Am. Compl. ¶ 75.) Thereafter, Van traveled to the Chesterfield County Magistrate's Office and obtained criminal warrants against Hartnett for conspiracy to injure business reputation, *see* Va. Code § 18.2-499, and trespass after having been forbidden to do so, *see* Va. Code § 18.2-119. (*Id.* ¶ 76.)

Hartnett asserts that Van falsely alleged a conspiracy between July 24, 2019, and March 25, 2022, between Hartnett and her counsel to bring criminal charges against the Hardenberghs to extort money from them. (*Id.* ¶ 77.) Further, Hartnett alleges that Van falsely claimed that, on December 16, 2021, she trespassed on his property, based upon a visible no trespassing sign. (*Id.* ¶ 78.) Hartnett states that at no time was she on their property. (*Id.*)

On or about May 4, 2022, allegedly with the cooperation of Mari and Mr. De La Cruz, Van filed a petition for a protective order against Hartnett with the City of Petersburg General District Court. (*Id.* ¶ 79.) A preliminary protective order was issued on May 5, 2022. (*Id.*) Hartnett alleges that in the petition for a protective order, Van falsely claimed that she assaulted the Hardenberghs, trespassed, conspired to extort money, is known to be armed, has a history of mental issues, stalked them, and made specific threats against them. (*Id.* ¶ 80.)

16

On or about May 16, 2022, Hartnett was arrested at her home in Petersburg on the criminal warrants sought by Van. (Am. Compl. ¶ 81.)  Additionally, Van sought seven more criminal warrants against Hartnett for alleged violations of the Preliminary Protective Order, none of which were ever served. (*Id.* ¶ 82.)  A hearing was eventually held on January 27, 2023. (*Id.* ¶ 83.)  A special prosecutor ultimately *nolle prossed* both misdemeanor charges against Hartnett and obtained an order from the court to destroy the unserved warrants against her. (Am. Compl. ¶ 84.)

The Petersburg General District Court then heard Van's testimony and received evidence related to the petition for protective order. (*Id.* ¶ 85.)  Once Van admitted to making the Facebook posts to "bait" Hartnett into reacting and doing something against her own interest, his counsel immediately moved to dismiss his petition for a protective order. (*Id.*)  Hartnett alleges that all the previously mentioned actions have forced her to move from Virginia to North Carolina.  She also maintains that she has suffered tremendous harm to her reputation and large legal fees in defending these fraudulent charges. (*Id.* ¶ 87.)

## II.  LEGAL STANDARDS

As previously mentioned, Defendants filed their Motion pursuant to Rules 12(b)(1) and 12(b)(6).  The Court will address each basis for dismissal in turn.

### A. Rule 12(b)(1) Motion

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins.*

17

*Co. of Am.*, 511 U.S. 375, 377 (1994). They possess only such power as is authorized by the United States Constitution or conferred by statute. *Id.* "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)). Accordingly, Rule 12(b)(1) allows a defendant to move for dismissal of a claim when the court lacks subject matter jurisdiction over the action.

Defendants may challenge subject matter jurisdiction on a 12(b)(1) motion in one of two ways. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). First, the defendant may "contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (citation and internal quotation marks omitted). In that case, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* Second, a defendant can argue "that the jurisdictional allegations of the complaint are not true." *Id.* Under such a scenario, courts can consider evidence beyond the pleadings. *Id.*; *see also White Tail Park. Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). Under either circumstance, plaintiffs carry the burden of proving subject matter jurisdiction. *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008).

Defendants challenge under the second basis, arguing that this Court lacks subject matter jurisdiction because complete diversity does not exist between the parties. (Defs.'

18

Mem. in Supp. at 7, ECF No. 25.) They argue that Hartnett never intended to abandon her Virginia domicile, which was unquestionably her domicile at the start of all the prior state court proceedings related to this case. (*Id.*) Conversely, Hartnett argues that although she maintained a Virginia domicile for most of her life and at the start of her initial state court proceedings against Defendants, she moved to North Carolina with every intent to establish a new domicile there. (Pl.'s Mem. in Opp'n at 12, ECF No. 27.)

To establish diversity jurisdiction, "the parties must be completely diverse; none of the plaintiffs may share citizenship with any of the defendants." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999). Complete diversity must exist as of the filing of the plaintiff's complaint. *See Aiheno Auto. Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999). Further, the plaintiff also bears the burden of establishing complete diversity. *See Hem Corp. v. Friend*, 559 U.S. 77, 96–97 (2010).

"An individual is a citizen of the state in which he or she is domiciled." *Bloom v. Libr. Corp.*, 112 F. Supp. 3d 498, 502 (N.D.W. Va. June 30, 2015). Allegations of residence alone do not establish state citizenship. *Id.* Domicile requires physical presence, coupled with an intent to make that state your home. *See Johnson v. Advance Am.*, 549 F.3d 932, 937 n.2 (4th Cir. 2000). A change in residence without a change in intent to return to the original state of residence does not indicate a change in domicile. *Lewis v. Splashdam By-Products Corp.*, 233 F. Supp. 47, 49 (W.D. Va. 1964). Unless a person's intent changes, the domicile is not altered. *Id.*

When citizenship is questioned, a court must make an individualized inquiry

19

relying on certain factors such as voter registration; current residence; the location of real and personal property; location of bank and brokerage accounts; membership in clubs, churches, or other associations; place of employment or business; driver's license and automobile registration; and the state to which a person pays taxes. No single factor is dispositive.

*Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 195 (4th Cir. 2017) (internal citations omitted). Therefore, Hartnett must establish that diversity of citizenship exists by a preponderance of the evidence. *Zoroastrian Ctr. and Darb-E-Mehr of Metropolitane v. Rustam Guiv Foundation of N.Y.*, 822 F.3d 739, 748 (4th Cir. 2016).

Defendants argue that Harnett's lack of intent to abandon her Virginia domicile is evidenced by the way Hartnett gifted her Petersburg, Virginia, real property to her nephew. (Defs.' Mem. in Supp. at 9.) On July 20, 2022, Hartnett recorded in the Petersburg Circuit Court a deed of gift, transferring a portion of Hartnett's fee to her residence in Petersburg to her nephew. (*Id.* at 4.) Although that deed gifted a portion of the fee to her nephew, Hartnett specifically retained a life estate, and the ability to reside in the property if necessary. (*Id.*) In maintaining a life estate in her property, Defendants assert that Hartnett indicated her desire to return to her domicile, and therefore, as a matter of law, did not abandon her domicile in its entirety. (*Id.*) They also contend that this is further evidenced by Hartnett being frequently seen at the property by neighbors and that her vehicle was seen overnight on several occasions over the last few months. (*Id.*)

Hartnett argues that simply maintaining a life estate in her property is not dispositive as to her intent to change her domicile to North Carolina. (Pl.'s Mem. in

20

Opp'n at 11.) Instead, based on the factors laid out by the Fourth Circuit in *Scott*, there is substantially more evidence showing her intent was to permanently change her domicile to North Carolina. 865 F.3d at 195. Plaintiff is registered to vote in North Carolina; she has resided in North Carolina since June 9, 2022; she pays for utilities at her North Carolina residence; her personal property, such as her vehicle and furniture, are located in North Carolina; she is a member of a church in North Carolina; and her driver's license, car insurance, title, and registration are also in North Carolina. (*See* Exs. 1–8 to Pl.'s Mem. in Opp'n, ECF Nos. 1-1–1-8.) While not employed at this time, Hartnett intends to pay both Virginia and North Carolina taxes that are owed for 2022. (Pl.'s Mem. in Opp'n at 12.) Hartnett further alleges that while she was a lifelong resident of Petersburg until June 2022, she moved out of Petersburg to Littleton, North Carolina, because of Defendants' alleged unlawful actions. (*Id.* at 13.) Lastly, she alleges that she has visited Virginia for on-going medical treatments, court appearances, and to visit her sister. (*Id.*) When doing so, she stays at her previous residence in Petersburg overnight before returning to North Carolina. (*Id.*)

The Court agrees that Hartnett has clearly established that she abandoned her old Virginia domicile and established a new one in North Carolina. At the time Hartnett filed her original Complaint (ECF No. 1) on January 5, 2023, she had been living in North Carolina for six months. Although Defendants argue that her maintaining a life estate creates some presumption that she did not intend to give up her Virginia domicile, that presumption is clearly rebutted by all the other actions taken by her to establish a new

21

domicile in North Carolina. Because someone retains the *ability* to return to a residence, does not definitively mean they *intend* to do so. Therefore, according to the evidence submitted by Hartnett in response to Defendants' challenge of her citizenship, the Court concludes that Hartnett sufficiently established that she is a domiciliary of North Carolina by a preponderance of the evidence. As such, complete diversity exists between the parties and the Court has jurisdiction over this matter.

### B. Rule 12(b)(6) Motion

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). A "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 679). A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the

complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted).  A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166.  "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached, . . . the exhibit prevails." *Id.* (alteration in original) (quoting *Fayetteville Invs. v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

### i.  Defamation Claim

In Virginia, the elements of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005).  To be actionable, the statement must not only be false, but also defamatory, "tend[ing] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).  "[D]efamatory words are those that make the plaintiff appear odious, infamous, or ridiculous." *Id.*  "Defamatory statements may include statements made by inference, implication, or insinuation." *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009).  Further, the Court "must consider the statement as a whole." *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011).

Defendants argue that Hartnett has failed to plead any concrete facts to support her contention that Mr. De la Cruz, Mari, or the Corporate Defendants published an

actionable defamatory statement about her. (Defs.' Mem. in Supp. at 11.)

As to Mr. De La Cruz, Defendants assert that there are no facts in the Amended Complaint that support the legal conclusion that Mr. De La Cruz, separate and apart from any other Defendant, made any statement that could be considered defamatory. (*Id.* at 12.) They argue that "[n]o specific Facebook posts are identified nor is Mr. De La Cruz mentioned by name as making any statements." (*Id.*) To tie in Mr. De La Cruz, they contend that Hartnett can only rely on Van's testimony, which stated, "[t]here was definitely a lot of group editing on that post. And different people had different ideas about what should go into it." (*Id.*)

On the other hand, Hartnett argues that she has adequately pled her defamation claim because "the Amended Complaint clearly identifies Mr. De La Cruz as being involved in drafting [Facebook] posts by Mr. Hardenbergh on March 17 and 29, 2022." (Pl.'s Mem. in Opp'n at 15.) She argues that this is further evidenced by the fact that Van implied and later testified, as to the March posts, that "[he didn't] recall that [he] wrote that. There was definitely a lot of group editing on that post. And different people had different ideas about what should go into it." (*Id.*) Hartnett further argues that at this stage she cannot allege more than that Mr. De La Cruz was involved in crafting the allegedly defamatory posts because the "specific knowledge of who was involved in the drafting of the defamatory Facebook posts is solely in the possession of Defendants." (*Id.* at 16.)

The Court finds that Hartnett has not sufficiently pled a claim of defamation as to

24

Mr. De La Cruz.  The only references in the Amended Complaint that tie Mr. De La Cruz

to the alleged defamatory Facebook posts are that "[Van] also testified that this post was

likely written by several individuals, including himself, [Mari], and Mr. De La Cruz."

(Am. Compl. ¶ 68.)  Aside from Hartnett's reference to this testimony, there are no other

specific indications that Mr. De La Cruz was the one who posted or even contributed to

the defamatory posts.  Moreover, Van's testimony does not specifically refer to Mr. De

La Cruz, only that a "group" contributed to the Facebook posting.  For these reasons,

Plaintiff has failed to plead an actionable defamation claim against Mr. De La Cruz, and

Count II will be dismissed as to that Defendant.

As to Mari, Defendants argue that she cannot be liable for the republication of

alleged defamatory statements made by Van.  (Defs.' Mem. in Supp. at 13.)  They argue

that Hartnett cannot "bootstrap" her defamation claim against Mari with her claim against

Van simply because she republished or reposted Van's Facebook post.  (*Id.*)

Additionally, they claim that the statement that Hartnett is a liar "merely expresses an

opinion and does not rise to the level of defamation."  (*Id.* at 14–15.)

Hartnett argues that Mari can be held liable for her reposting and republishing of

Van's posts because she would have personal knowledge that his posts were false and

posted them anyway.  (Pl.'s Mem. in Opp'n at 17.)  Hartnett argues that because Mari

was involved in the underlying incidents and she repeated Van's postings knowing that

the words were false or inherently improbable, or there were obvious reasons to doubt

their veracity, she can be held liable for the posts' defamatory content.  (*Id.*)

25

"'Repetition of another's words does not release one of the responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted.'" *Eramo v. Rollingstone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969)); *see also Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 485 (E.D. Va. 2018).

It is well established that to state a person is a liar is actionable for defamation in certain contexts.

> The terms 'lie' and 'liar' are frequently used to characterize statements with which the speaker vehemently disagrees. If in context the words mean that the defendant disapproves, it is a protected epithet. *If it literally implies that the plaintiff made a specific assertion or a series of assertions knowing them to be false, it may be actionable.*

*Edwards v. Schwartz*, 378 F. Supp. 3d 468, 525 (W.D. Va. 2019) (citing Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2.4.7 4th ed. 2010) (emphasis added).

The Court concludes that Hartnett has adequately plead a claim of defamation against Mari for the reposting of Van's Facebook posts. This Court has held that someone who republishes or reproduces a defamatory writing can be liable if they do so knowing the post is false or inherently improbable. *See League of United Latin Am. Citizens-Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No 1:18-cv-423, 2018 WL 3848404, at *1, 7 (E.D. Va. Aug. 13, 2018) (holding that a "sequel" to an allegedly defamatory original document was considered republication and actionable

26

because the sequel document repeated the allegedly defamatory statements in full, instead of simply referencing it). When the facts as Hartnett has asserted are taken as true, as the Court must do at this stage, they show that Mari did repost Van's alleged defamatory posting, knowing that what she was posting was false or at least inherently improbable.

Additionally, although Defendants argue that simply calling someone a "liar" is only a matter of opinion, the way these alleged defamatory posts were made, when taking the statements as a whole and in context, it is clear that the posts were not simply a matter of opinion. Instead, they were designed with the intention to disparage Hartnett by asserting that she "made a specific assertion or a series of assertions knowing them to be false," making the posts actionable. *Edwards*, 378 F. Supp. 3d at 525. Therefore, Hartnett has sufficiently pled a defamation claim against Mari, and Defendants' Motion as to her will be denied.

Hartnett has also alleged a defamation claim against the Corporate Defendants. The only allegation against the Corporate Defendants is as follows:

> The Hardenberghs and/or employees or agents [of the Corporate Defendants] authorized, prepared, and/or publicly displayed for several weeks in late March and April 2022 a large sign on the east side of Mr. Hardenbergh's law office, located at 139 Monroe Street, Petersburg, Virginia, that falsely stated, inferred, or implied that Hartnett is a registered sex offender, extortionist, liar, and violent.

(Am. Compl. ¶ 98.)

"[I]t is well established that although libel is generally perpetrated by written communications, it also includes defamation through the publishing of pictures or

photographs." *See, e.g., Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 80 (W. Va. 1983); *Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 786 (W.D. Va. 2014) ("A photograph can constitute a defamatory statement." (citing *Peck v. Trib. Co.*, 214 U.S. 185, 188 (1909)); *see also White v. Nicholls*, 44 U.S. 266, 291 (1845) ("[E]very publication, either by writing, printing, or *pictures*, which charges upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is prima facie a libel, and implies malice in the author or publisher towards the person concerning whom such publication is made." (emphasis added))).

Defendants argue that Hartnett cannot establish a claim of defamation against the Corporate Defendants because the Amended Complaint "does not allege *which* corporate defendant purported to take *what* actions, if any. The alleged sign does not name the plaintiff, nor does it make a statement regarding the plaintiff." (Defs.' Mem. in Supp. at 16 (emphasis in original).) They assert that because Hartnett has not established which employee or agent of the Corporate Defendants allegedly "authorized, prepared, and/or publicly displayed" the allegedly defamatory sign, she has failed to plead any type of *respondeat superior* liability or agency theory against the Corporate Defendants.

Conversely, Hartnett contends that although she does not specifically plead as to which Corporate Defendants printed and published the sign containing Hartnett's pictures, she points specifically to testimony provided by Van which stated that he was not the one who printed the sign, but that "some folks in [his] office printed it" and he "knew of it." (Hr'g Tr. at 87:14–88:05.) Hartnett argues that with Van's testimony, she

28

has pled a "short and plain statement of the claim" against the Corporate Defendants, which is all that is necessary at this stage. (Pl.'s Mem. in Opp'n at 21.) Thus, she contends that the Corporate Defendants are aware of exactly what Hartnett is suing them for—"defamation related to the preparation and display of the defamatory sign." (*Id.*) Moreover, based on Van's testimony, Hartnett claims that "[t]he knowledge of who was specifically involved in the creation, printing, and display of the defamatory sign is solely in the possession of Defendants." (*Id.* at 20.)

The Court finds that Hartnett has sufficiently pled the elements of a defamation claim against the Corporate Defendants. Hartnett establishes the publication element as to the Corporate Defendants by pointing to Van's testimony that "some folks in [his] office printed it" and without discovery, she cannot point definitively at which Corporate Defendants' employee or agent posted it. Van's testimony establishes that he was aware that someone at his office posted the allegedly defamatory poster, and she has alleged that the Corporate Defendants are owned and, at least in part, are controlled by the Hardenberghs. Thus, at this stage, Hartnett has sufficiently pled a defamation claim against the Corporate Defendants to survive Defendants' current Motion.

### ii. Malicious Prosecution Claim

Under Virginia law, "a cause of action for malicious prosecution will lie for the malicious institution of a groundless civil proceeding." *Donohue Const. Co., Inc. v. Mt. Vernon Assocs.*, 369 S.E.2d 857, 862 (Va. 1988). "The plaintiff must allege and prove that: (1) the prosecution was set on foot by the defendant and was terminated in a manner

29

not unfavorable to the plaintiff; (2) it was instituted or procured by the cooperation of the defendant; (3) it was without probable cause; and (4) it was malicious." *Ayyildiz v. Kidd*, 266 S.E.2d 108, 110 (Va. 1980). Further, a "plaintiff in a malicious prosecution action based upon civil proceedings must plead and prove arrest of his person, seizure of his property, or special injury." *Donohue Const. Co., Inc.*, 369 S.E.2d at 862. "[I]nstigation or co-operation may be chargeable to the defendant from original steps taken by him to incite the prosecution, or from subsequent adoption and ratification by him of steps of which have already been taken or instigated by others." *Clinchfield Coal Corp. v. Redd*, 96 S.E. 836, 839 (Va. 1918).

"[M]alice is defined as any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998). Additionally, malice can be inferred from "a history of animosity between the parties because the determination of malice is based on the parties' entire course of conduct towards each other" or "a lack of probable cause." *Dill v. Kroger Ltd. P'ship I*, 860 S.E.2d 372, 380 (Va. 2021).

Defendants argue that there are no facts sufficiently pled to support a malicious prosecution claim against Mari or Mr. De La Cruz because seeking a protective order does not constitute malicious prosecution and they did not cooperate with the issuance of the protective order. (Defs.' Mem. in Supp. at 22.) They allege this is evidenced by the fact that they did not sign the protective order and "[t]heir names are only included on the

30

petition to identify them as family or household members who would be protected by the issuance of the protective order." (*Id.*)

Conversely, Hartnett asserts that she has sufficiently pled a claim for malicious prosecution against Mari and Mr. De La Cruz for two reasons. First, at the hearing for the protective order, Hartnett claims that the Hardenberghs' counsel argued that "[t]he petition specifically seeks the protective order regarding [Mari] and [Mr.] De La Cruz. Although it's captioned in the name of Mr. Hardenbergh, I believe that they should be considered parties and would be allowed to stay in the courtroom . . . ." (*See* Hr'g Tr. 24:14–24:19, 28:20–29:01.) Defense counsel further articulated that "I'm here on behalf of Mr. and Mrs. Hardenbergh and they are seeking . . . a protective order against Pam Hartnett to prohibit her from acts of violence, force, or threat that they believe will result in injury to their persons or property." (*Id.* at 28:21–29:09.) Additionally, both Mari and Mr. De La Cruz were physically present at each court hearing regarding the petition for the protective order. (Pl.'s Mem. in Opp'n at 23.) Hartnett argues that their "inclusion [within] the protective order" and their presence at the hearing "constitutes active cooperation, adoption, and ratification of the institution of civil proceedings for a protective order." (*Id.*)

Second, Hartnett further argues that she has established the requisite malice by pleading that "[a]t all times, Defendants, particularly the Hardenberghs, have been motivated by hatred, personal spite, ill will, and a desire to punish Hartnett. Defendants' actions were willful, wanton, intentional, and performed with malice and/or reckless

31

disregard for Hartnett's rights and well-being." (Am. Compl. ¶ 105.) Hartnett alleges

that Mari and Mr. De La Cruz knew the "outlandish" allegations contained in the

protective order were false or, at least in the case of Mr. De La Cruz, ratified those

allegations with reckless disregard of whether they were false or not. (Pl.'s Mem. in

Opp'n at 23.) In doing so, they acted without probable cause and "'upon no or such

slight grounds of suspicion as to indicate a general disregard of [others].'" (*Id.* (quoting

*Freezer v. Miller*, 176 S.E. 159, 168, 170 (Va. 1934)).)

The Court concludes that Hartnett has sufficiently pled a malicious prosecution

claim against Mari, however, she has not as to Mr. De La Cruz. As to Mari, Virginia law

is clear that a malicious prosecution claim can stem from "a groundless civil proceeding."

*See Donohue Const. Co.*, 369 S.E.2d at 862. Therefore, Defendants improperly seeking a

protective order can support a claim for malicious prosecution.[8] Additionally, Hartnett

has established the requisite malicious intent requirement as to Mari because the

Amended Complaint is replete with instances indicating "a history of animosity between

the parties . . . based on the parties' entire course of conduct towards each other." *See*

*Dill*, 860 S.E.2d at 380. Moreover, at this stage in the proceedings, Hartnett has

established that Mari cooperated in the issuance of the protective order or, at the very

---

[8] The Court notes that Count V states, "Malicious Prosecution – Criminal and Civil" and alleges
that those claims are brought against Van, Mari, and Mr. De La Cruz. (Am. Compl. at 26.) To
clarify, the Court construes that the criminal malicious prosecution has only been pled against
Van, and the civil malicious prosecution case has been pled against all three. There are no facts
alleged to indicate that Mari or Mr. De La Cruz can be held liable for a claim of criminal
malicious prosecution as the Amended Complaint does not indicate that they initiated or ratified
any of the criminal proceedings brought against Hartnett.

least, ratified actions already set in motion by Van. Mari was personally involved in the underlying circumstances that supported the filing of the protective order, she was present at the court proceedings involving the protective order, and the Hardenberghs' defense counsel represented that the Hardenberghs together were seeking the protective order. Therefore, Hartnett has adequately pled that Mari cooperated or ratified the issuance of the protective order under improper circumstances that she allegedly knew were false.

As to Mr. De La Cruz, Hartnett has failed to establish the necessary malicious intent requirement to support a malicious prosecution claim. Although the Amended Complaint clearly references the contentious history and animosity between the Hardenberghs and Hartnett, she fails to indicate that there was similar history between herself and Mr. De La Cruz. Moreover, although Mr. De La Cruz was present at the protective order proceedings, there is nothing additional to indicate that he cooperated or ratified the issuance of the protective order, outside of being a member of the Hardenberghs' household. Furthermore, Hartnett does not allege that Mr. De La Cruz had any personal knowledge that the underlying circumstances supporting the protective order were false, only that he "ratified those allegations with reckless disregard of whether they were false or not." (Pl.'s Mem. in Opp'n at 23.) Virginia law does not indicate that ratifying allegations with reckless disregard of their falsity alone can support a claim for malicious prosecution under these circumstances. Therefore, the Court finds that Hartnett has sufficiently pled a malicious prosecution claim as to Mari but has not

33

done so as to Mr. De La Cruz.  Accordingly, Count V will be dismissed as to Mr. De La Cruz.

### iii.  Hartnett's Claims for Negligence, Gross Negligence, and Willful and Wanton Negligence

In addition to Hartnett's other claims, she also alleges claims of negligence, gross negligence, and willful and wanton negligence in Count III against the Hardenberghs. Defendants argue that she has improperly pled all three causes of action under a single count and "[b]ecause the complaint does not distinguish any particular facts associated with any of the three causes of action . . ., it must be dismissed."  (Defs.' Mem. in Supp. at 23.)

Under Federal Rule of Civil procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Further, under Rule 8(d)(2), a plaintiff "may set out 2 or more statements of a claim . . . either in a single court . . . or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  In Virginia, "[a]n allegation of negligence . . . is sufficient without specifying the particulars of the negligence."  Va. Sup. Ct. R. 3:18.

Virginia law recognizes three levels of negligence.  *See Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004).  The first level, simple negligence, "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another."  *Id.* (citing *Gossett v. Jackson,*

34

457 S.E.2d 97, 100 (Va. 1995)).  The second level, gross negligence, "is a degree of

negligence showing indifference to another and an utter disregard of prudence that

amounts to a complete neglect of the safety of such other person.  This requires a degree

of negligence that would shock fair-minded persons, although demonstrating something

less than willful recklessness." *Id.* (citing *Koffman v. Garnett*, 574 S.E.2d 258, 260

(2003)).  The third level, willful and wanton negligence, "is defined as 'acting

consciously in disregard of another person's rights or acting with reckless indifference to

the consequences, with the defendant aware, from his knowledge of existing

circumstances and conditions, that his conduct probably would cause injury to another.'"

*Id.* (quoting *Etherton v. Doe*, 597 S.E.2d 87, 90 (2004)).

As these definitions illustrate, there are fundamental distinctions between each

cause of action, however, the distinctions are ones of degree.  "Whether certain actions

constitute [a specific degree of negligence] is generally a factual matter for resolution by

the jury and becomes a question of law only when reasonable people cannot differ . . . ."

*Koffman*, 574 S.E.2d at 260.

Here, the Court concludes that Hartnett has adequately pled claims of negligence,

gross negligence, and willful and wanton negligence against the Hardenberghs in

Count III.  As previously mentioned, Rule 8(d)(2) allows Hartnett to plead more than one

cause of action, or alterative theories of liability, under a single count.  So long as

Hartnett delineates how the Hardenberghs' conduct supports a claim as to each degree of

negligence recognized under Virginia law, the issue of what degree of negligence

35

actually applies becomes one of fact to be determined by the jury.

In paragraphs 109 to 111 of the Amended Complaint, Hartnett clearly alleges that the Hardenberghs breached their "duty of reasonable and ordinary care to avoid injury to Hartnett" when, *inter alia*, "they beat and injured" her in their vehicle and her home. (Am. Compl. ¶¶ 109–11.) Further, in paragraphs 112 to 113, she alleges that the Hardenberghs "acted with indifference to and/or exhibited an utter disregard and prudence to Hartnett" when they, *inter alia*, beat and injured her. (*Id.* ¶¶ 112–13.) Lastly, in paragraphs 114 to 116, Hartnett also alleges that the Hardernberghs "were aware, or should have been aware, from their knowledge of existing circumstances and conditions" that their conduct, *inter alia*, of beating and injuring Harnett would result in severe injury to her. (*Id.* ¶¶ 114–116.) Given their knowledge and awareness, by engaging in that conduct, they were willfully and wantonly negligent toward Hartnett. (*See id.*)

Although Defendants may disagree with Hartnett pleading her negligence claims within a single count, she has differentiated between the degrees of negligence and adequately pled "a short and plain statement" of each claim showing she is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). Therefore, the Court will deny Defendants' Motion as to Count III.

### III.    CONCLUSION

In sum, Defendants' Motion (ECF No. 24) will be granted in part and denied in part. Defendants' Motion will be granted in part as to Hartnett's defamation and

malicious prosecution claims against Mr. De La Cruz.  Accordingly, those claims will be

dismissed without prejudice, and Mr. De La Cruz will be dismissed as a party to this

action.  As to all other arguments, Defendants' Motion will be denied.

An appropriate Order will accompany this Memorandum Opinion.


_____ /s/

Henry E. Hudson
Senior United States District Judge

Date: August 2, 2023
Richmond, VA

37