IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PAMELA K. HARTNETT,                )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Civil Action No. 3:23-cv-17–HEH
                                   )
CHARLES VANEVERA                   )
HARDENBERGH, *et al.*,             )
                                   )
        Defendants.                )

## MEMORANDUM OPINION
### (Resolving Summary Judgment Motions)

THIS MATTER comes before the Court on ten (10) Motions for Summary Judgment. Defendant Charles Vanevera Hardenbergh ("Charles") filed three (3) of those motions (ECF Nos. 170, 182, 341), Defendant Mari Liza Hardenbergh ("Mari") filed two (2) of those motions (ECF Nos. 176, 339), and the remaining parties each filed one summary judgment motion: Pamela K. Hartnett ("Plaintiff") (ECF No. 303), 135 Monroe, LLC (ECF No. 172), The Monroe Building, LLC (ECF No. 174), Commonwealth Attorney Marketing Service, LLC ("CAMS") (ECF No. 178), and Charles V. Hardenbergh, PC (ECF No. 180). Relevant to Plaintiff's summary judgment motion, Defendants Charles and Mari (collectively, the "Hardenberghs") have raised counterclaims for malicious prosecution in this case. The Court held a hearing on these motions on December 9, 2024. The Court resolves the motions as follows.

# I. BACKGROUND

## A. Events During July 20–25, 2019

This case springs from events that began on Saturday, July 20, 2019.  As alleged in the First Amended Complaint (ECF No. 9)—and reasserted in Plaintiff's First Deposition (ECF No. 202-5), her May 20, 2024 Affidavit ("Plaintiff's Affidavit," ECF No. 202-26), and her Answers to Charles' First Discovery Requests (ECF No. 202-15)—Plaintiff started that evening by riding with Charles and Mari Hardenbergh in their limousine on a trip from Petersburg to a charity event in Richmond.  (Am. Compl. at 5; Pl.'s First Dep. at 27).[1]  At that time, Plaintiff was a volunteer director for a charity organization the Hardenberghs operated.  (*Id.*)  Plaintiff, Charles, and Mari consumed several alcoholic drinks throughout the course of the evening.  (Am. Compl. at 5.)  On their ride back to Petersburg, the three of them engaged in an argument about Plaintiff's work for the Hardenberghs' charity.  (*Id.* at 6.)  As the argument escalated, Plaintiff alleged, Charles physically attacked Plaintiff on the bench seat in the limousine.  (*Id.*; Pl.'s First Dep. at 29–30.)  Charles beat her with his hands, and he held a pillow on her face while Mari beat Plaintiff on her head.  (Am. Compl. at 6; Pl.'s First Dep. at 29–30.)

Upon reaching the Hardenberghs' house in Petersburg, Plaintiff left the limousine and walked the short distance to her house while in shock.  (Am. Compl. at 6.)  When Plaintiff arrived at her home, she took two pictures of the injuries to her face.  (*Id.*; ECF No. 9-2 at 1–2.)  Mari went to Plaintiff's house as well, but Plaintiff refused to let her in.  (Am. Compl. at 7.)  Around the same time, Charles entered the house without permission.

---

[1] The Court uses the pagination generated by CM/ECF rather than the pagination in the underlying documents.

(*Id.*) Charles chased and caught Plaintiff inside the house, took her phone, and proceeded to further beat and injure her, breaking a table in the process. (*Id.*; ECF No. 9-3.) At some point, Mari also entered Plaintiff's house and grabbed Plaintiff's phone, her iPad, and her security camera. (Pl.'s First Dep. at 44.) Charles told Plaintiff that he wanted to take her into the bathroom to wash her face. (Am. Compl. at 8.) Plaintiff, in shock and confusion, replied, "If Mari leaves, I will let you wash my face." (*Id.* at 8.) At that time, Mari left the house, taking Plaintiff's devices with her. (*Id.*)

Sometime later that night, Plaintiff was lying on her bed in great pain and she eventually lost consciousness. (Am. Compl. at 8.) Charles then grabbed Plaintiff's wrist and dragged her off her 36-inch-high bed causing her to land on her left hip. (*Id.*; Pl.'s First Dep. at 52–53.) Plaintiff regained consciousness when her body hit the floor. (Pl.'s First Dep. at 52–53.) Charles dragged Plaintiff into the bathroom, helped her up off the floor, washed her face, then directed her to take off all her clothes and return to her bed. (*Id.*) After that, Charles left Plaintiff alone in her house for several hours. (*Id.* at 44; Am. Compl. at 9.) Charles came back the following morning at about 6:30 or 7:00 a.m. He returned Plaintiff's phone to her, and he began to cry and to beg Plaintiff for her forgiveness. (Pl.'s First Dep. at 44; Am. Compl. at 8).

Shortly thereafter, Charles and Mari pressured Plaintiff to accompany Charles to Lexington, Virginia. (Am. Compl. at 9.) Plaintiff entered Charles' car and rode to Charles' house in Lexington. (Am. Compl. at 9; Pl.'s First Dep. at 41.) Later, the two of them sat in a hot tub while Charles tried to explain that he and Plaintiff had simply been in a fight, like siblings. (Pl.'s First Dep. at 41–42.) While the two were in Lexington for

3

the next few days, Charles left the house in the mornings to go to work at his nearby office and Plaintiff charged her phone just enough each day to take more pictures of herself and her injuries. (*Id.*; ECF No. 9-5.) Plaintiff also contacted several friends to share her plight that she was in Lexington staying with Charles without a vehicle. (Pl.'s First Dep. at 42–43.) Plaintiff tried to organize a rental with the Enterprise rental car agency in a way that she would be picked up from Charles' house in Lexington, but no vehicle was available. (*Id.*) Several times she asked Charles to take her home to Petersburg, but he refused. (Am. Compl. at 10.) Charles and Plaintiff stayed in Lexington for four nights. (Pl.'s First Dep. at 41, 43.) On Thursday, July 25, 2019, Plaintiff drove Charles to the Hanover County courthouse, and later that afternoon the two returned to Petersburg.[2] (Am. Compl. at 10; Pl.'s First Dep. at 41.) Charles would not allow Plaintiff to be seen in public because the injuries on her face were still noticeable. (Am. Compl. at 10; Pl.'s First Dep. at 41.)

### B. Plaintiff's Pursuit of Criminal Charges Against the Hardenberghs

Late in the evening of July 25, 2019, Plaintiff filed criminal complaints against Charles and Mari. (ECF No. 9-7.) About four months later, on November 18, 2019, Special Prosecutor Richard Newman ("Newman") sought a nolle prosequi order for the criminal warrants against the Hardenberghs, which Newman did over Plaintiff's opposition. (Am. Compl. at 11.) Plaintiff obtained more criminal warrants against the Hardenberghs, but those warrants again were nolle prossed by Newman in Petersburg General District Court on December 16, 2019. (*Id.*)

---

[2] Plaintiff worked as Charles' personal driver on a limited basis beginning in 2017. (Am. Compl. at 5).

4

The next month, on January 8, 2020, Newman obtained grand jury indictments against Charles and Mari. (ECF No. 202-22.) About two years later, Newman sent an email indicating how he would resolve those charges. (ECF No. 202-25.) The email was sent on December 10, 2021, and it stated that Newman would "take a nolle prosequi of the charges" if the Hardenberghs (1) "paid [Virginia Department of Criminal Justice Services] DCJS in full as to all of the amounts that have been disbursed to Ms. Hartnett due to treatment received," and (2) "enrolled in anger management classes." (*Id.*) Newman then moved for an entry of nolle prosequi on January 6, 2022. (ECF No. 9-9.) The state court entered a Nolle Prosequi Order on January 20, 2022. (*Id.*)

### C. Online Facebook Posts and the Sign

After the criminal charges against the Hardenberghs were no longer pending, Charles and Mari embarked on what Plaintiff describes as "a defamation campaign" from March to April 2022. (Am. Compl. at 12.) Charles and Mari began publishing posts about Plaintiff on the website, Facebook, on pages that were open to the public. (Am. Compl. at 12–16; ECF No. 202-29 at 25–31.) On March 17, 2022, Charles posted the following statement:

THE THING ABOUT PAM...

If y'all haven't seen this fascinating new series about a CRAZY Pam, it is riveting. Pam appears to be a pillar of the community, but underneath it she is a lying sociopath who ingratiates herself and tries to make herself part of the victim's family. The similarities between the real-life Pam H and our own local crackpot Pam H are eerily uncanny. Motivated by greed and a desire for control over others, both seek to constantly undermine people by lying and seeking to cast blame on innocent victims after perpetrating unthinkable crimes against them. They give Pams a bad name!!! You will definitely get a blast out of this excellent drama based on real life...

5

("Charles' Statement #1," Am. Compl. at 13 (ellipses in original).)

A different user posted a comment which stated, "So, this is an accurate portrayal

of 'that' Pam ??? Lol." Charles replied to that comment, stating:

> I couldn't say how accurate it is. Some folks who lived in the location where
> Pam Hupp committed her crimes have commented in an online fan forum
> that the characters are EXACTLY like their real-life counterparts. I can say
> that the similarities between this disturbed bird and our real-life Pam H here
> in Petersburg are numerous. Both are accomplished liars who are completely
> self-centered, manipulative, and dangerous parasites. More to come…

("Charles' Statement #2," Am. Compl. at 13 (ellipses in original).)

Two days later, on March 19, Mari posted the following statement on Facebook:

> We never regret being kind to the wrong people because the wrong people
> are often the victims of liars. But our specialty is uncovering the truth. So if
> you've been the victim of a con artist, call us at 1-866-Van-Wins and we will
> fight for you!
> #TheThingAboutPam.

("Mari's Statement #1," Am. Compl. at 13–14.) Charles shared Mari's post on his own

account. ("Charles' Statement #3," *Id*.)

On March 29, Charles posted the following statement on Facebook:

> What's Pam's Problem???

> It's Pam Day!!! That's the day the latest episode of The Thing About Pam is
> released. Before we try to figure out what makes Pam so crazy, let's look at
> the Top Ten Things Pam Hupp has in common with Petersburg's own
> notorious Pam💜🥜 [heart nut][3], another known con artist with sociopathic
> tendencies, primarily lying – first and foremost she is a shameless liar who
> is fundamentally dishonest and treacherous…

> 1. Greed – Both had the same motivation for their crimes – to get money.
> 2. Strict Catholic Upbringing – They were raised in the church and act pious.

---

[3]  This moniker consists of a heart and peanut emoji, to refer to Plaintiff Hartnett as "Heart-nut."
Charles later testified that he used this emoji combination to refer to Plaintiff. (ECF No. 202-29
at 16–28.)

3. Violence – Both commit violent crimes, claiming their victims are to blame.

4. False Witness Against Thy Neighbor – Knowingly blaming innocent people.

5. Fired for Dishonesty – One for forging signatures, the other for embezzling.

6. Constantly Ingratiating Themselves – Wanting to be part of victims' family.

7. Relationship Status: Fail – One is twice divorced, one never got a proposal.

8. Next to the youngest – Both were born next to last in large families (4 & 7).

9. Inheritance – Greed strong enough to exclude siblings from a parent's estate.

10. Imposters – Both claimed in communications to be someone else. They lied.

("Charles' Statement #4," Am. Compl. at 14.)  Mari reposted Charles' statement and

added: "Pam 💖 is a shameless liar who is fundamentally dishonest and treacherous…,"

along with three pictures of Pam Hupp.  ("Mari's Statement #2," *Id*. at 15.)

On April 7, 2022, Charles posted:

SHOULD WOMEN WHO LIE FACE CONSEQUENCES?

History is full of men and women who made false accusations against others. The recent smash hit The Thing About Pam illustrates a prime example.  In our hometown it is a particularly fascinating phenomenon because of the striking similarities between the protagonist and our own disturbed dingbat, Pam💖 . . .

What motivated them?  In both cases, old fashioned greed.  Both Pams are courtroom veterans who have plotted and schemed to get money via fixed verdicts and shady claims.

Who made them that way?  It seems that both grew up at the hands of an abusive parent.  Both struggled with their weight.  Both got the bulk of their assets from the death of someone close to them.  Both pretended falsely to be the victim when in fact they were the perpetrator.

But there were also differences.  One is a mother of two, the other an old maid, a crone.  One is from the midwest, the other born and raised right here in Petersburg.  While the two aren't exactly identical, what they have in

common is truly apparent from the beginning.  If you haven't seen it, this is TOP quality binge watching material.  The final episode comes out next week, stay tuned!!!

("Charles' Statement #5," Am. Compl. at 15.)

On April 13, 2022, Charles posted, and Mari reposted, the following statement:

Too many BS crimes that waste their time, a prime example being Petersburg's notorious Pam❤️💋, who fabricated fantastic claims against Mrs[.] Fabulous and Yours Truly, charging us with preposterous counts of abduction, breaking and entering, assault, etc.  Even after the charges were dismissed 3 times by 3 different judges, this woman STILL tried to get the Magistrate to let her swear out the charges again.  When they refused, she slithered right over to the Police Department to see if perhaps they might receive her entreaties a bit more warmly.

No dice.  The by now long worn-out victim act was of no further use.  But y'all know that a leopard doesn't change it's spots, right?  Not to worry my friends, the story isn't over yet.  In fact, it's only just beginning!!!

Although I would LOVE to disclose ALL of the JUICY DETAILS and SALACIOUS GOSSIP that people has shared with us, the time has not quite yet come for the big reveal(s).  But what I can tell you is this: witnesses have stated that Pam has a lifelong pattern of trying to break up couples.  She ingratiates herself and seems like a bosom buddy at first, but it's a long con that unfolds treacherously over time.  More details on her MO and past victims to come.

For now, all I can confirm is that PART of the problem here in Petersburg is created by false claims that are composed of nothing but lies.  The liars who perpetrate these frauds are just like Pam Hupp and Pam ❤️💋, sociopaths who love to scheme and scam, wasting the time of police officers and attempting to frame completely innocent people as part of a greedy grifter's game of larcenous betrayal.  Stay tuned ya'll . . .

("Charles' Statement #6" or "Mari's Statement #3," *Id.* at 16.)

On January 27, 2023, Charles testified that he made these Facebook posts to bait

Plaintiff into reacting and taking some action against her own interest.  (ECF No. 202-29

at 25–31.)

Around the same time as the Facebook posts (between March and April 2022), Mari and Charles, or officers and agents of Charles V. Hardenbergh, PC, CAMS, The Monroe Building, LLC, and 135 Monroe, LLC, authorized, prepared, and publicly displayed a large sign on the side of a building in Petersburg. (The "Sign," ECF No. 9-11.) The Sign stated, "The Law Offices of Charles V. Hardenbergh proudly protect and defend the victims of," then included four images as depicted below:



(ECF No. 9-11.) Above the first picture, in large, red, capital letters, are the words "REGISTERED SEX OFFENDERS" and the picture depicts Plaintiff, her sister, and her

father. (*Id.*)  Above the second picture is the word "EXTORTIONISTS" and the picture depicts Plaintiff's attorney. (*Id*).  Exhibited across the bottom of the third picture is the word "LIARS" and the picture depicts Plaintiff.  Across the bottom of the fourth picture is the word "VIOLENCE" and it depicts Plaintiff's sister, Mary Hartnett. (*Id.*; ECF No. 202-3.)  Below the pictures, the Sign states, "CALL 1-866-VAN-WINS TO GET JUSTICE, GO AFTER CROOKED LAWYERS WHO VICTIMIZE POOR LITTLE OLD LADIES, OR TO RENT THIS SPACE." (ECF No. 9-11.)

During a hearing on January 27, 2023, Charles testified that he knew about the Sign, and also stated, "Some folks in my office printed it but it was not me." (ECF No. 202-29 at 18–20.)  In an answer to an interrogatory about the Sign, Charles stated, "I only know for sure that I was involved in the drafting, designing, creating, and printing the sign.  I don't recall who affixed the sign to the building." (ECF No. 202-31 at 15.)  Charles also testified during a deposition that "we wanted it [the Sign] to be there . . . ." for "a number of reasons." ("Charles' Deposition" at 61–62, ECF No. 202-3.)  One of those reasons was to gather "evidence to show that Ms. Hartnett was continuously driving by the building." (*Id.*)

The Sign was hung on the exterior wall of the 139 Monroe Street building in Petersburg. (Am. Compl. at 17.)  The 139 Monroe Street building houses the offices of Charles V. Hardenbergh, PC and CAMS. (Charles' Dep. at 9; Pl.'s First Dep. at 18.)  The Sign is larger than one of the building's windows and was displayed there for several weeks. (ECF No. 9-11; ECF No. 202-29 at 92; Charles' Dep. at 62.)

At the time Plaintiff filed her suit, she had been a resident of Petersburg for sixty (60) years. (Pl.'s First Dep. at 2). From 2016–2019, Plaintiff lived within two blocks of Charles and Mari in a Petersburg neighborhood. (*Id.*; Am. Compl. at 5.) Plaintiff alleges that due to Charles and Mari's violent acts, harassment, defamation, and damage to her good reputation, Plaintiff had to move her permanent residence to North Carolina from her lifelong home in Petersburg. (Pl.'s First Dep. at 2, 27). Plaintiff also testified that her mental health was damaged by Defendants' acts. (*Id.* at 13–14.) Special Prosecutor Newman believed Plaintiff had a condition called battered woman's syndrome, recommended she seek psychiatric therapy, and Plaintiff has since sought such therapy. (*Id.*; ECF No. 202-15 at 7.)

### D. Ownership of Buildings, LLCs, and the Law Firm

According to the record, The Monroe Building, LLC owns the 139 Monroe Street building. (ECF Nos. 202-7; 202-8; 202-9; Charles' Dep. at 28, 36, 64.) The Monroe Building, LLC was organized by Charles V. Hardenbergh, PC. (ECF No. 202-8 at 1–5.) Charles himself is the Registered Agent and a member of The Monroe Building, LLC. (*Id.*)

Charles is the Incorporator, Director, and Registered Agent of Charles V. Hardenbergh, PC (the "Law Firm"), for which he practices law. (ECF No. 202-5 at 1–5; Charles' Dep. at 7.) The Petersburg office of Charles V. Hardenbergh, PC is located in the building at 139 Monroe Street, though Charles also has an office in Lexington, Virginia. (Charles' Dep. at 7, 36, 67; Pl.'s First Dep. at 18.) Mari is the Chief Operating Officer of Charles V. Hardenbergh, PC ("Mari's Deposition" at 6, ECF No. 202-6.)

Charles is the Organizer of Commonwealth Attorney Marketing Service, LLC (CAMS), and Charles V. Hardenbergh, PC is its Registered Agent. (ECF No. 202-12 at 1–8.) Mari testified that she is the Chief of Operations for CAMS and that she also believes she has an ownership interest in CAMS. (Mari's Dep. at 6.) CAMS is a print shop that specializes in Virginia attorney advertising and in the regular course of its business is capable of producing signs and posters for its clientele. (Charles' Dep. at 13, 15; Pl.'s First Dep. at 19.)

Adjacent to 139 Monroe Street is 135 Monroe Street. (Charles' Dep. at 67.) The 135 Monroe Street building is owned by 135 Monroe, LLC. (ECF No. 202-11.) The LLC was organized by Mari, and its Registered Agent is Charles V. Hardenbergh, PC. (ECF No. 202-10.) Charles testified that either Mari, himself, or both of them own 135 Monroe, LLC. (Charles' Dep. at 64.)

Although the buildings at 135 Monroe Street and 139 Monroe Street are owned by different entities, Mari managed both of them. (Mari's Dep. at 7.) Specifically, Mari testified, "I manage all of our [Charles' and Mari's] properties. There's – I manage 135 Monroe, I manage 139 Monroe." (*Id.*)

### E. Charles and Mari's Pursuit of Criminal Charges against Plaintiff

According to two redacted criminal complaints, in May 2022, one or more individuals sought criminal charges against Plaintiff and her counsel for trespass and for conspiracy to injure the complainant's business or profession. (ECF No. 202-29 at 7–15; ECF No. 202-32 at 1–2; ECF No. 344-2.) One of those complaints states that the Plaintiff sought three sets of criminal charges against the complainant, and that this third

set of charges was dismissed over Plaintiff's objection in January 2022. (ECF No. 202-32 at 2.) The same month both these criminal charges were filed, May 2022, Charles petitioned for a protective order against Plaintiff. (Charles' Dep. at 69–70; ECF No. 202-34 at 1–5.) During a deposition, Charles testified that he probably drafted the language in the criminal complaints, but he was not sure whether he or Mari was the one who signed them. (ECF No. 202-3 at 251–59.) On January 24, 2023, Special Prosecutor Eric Olsen ("Olsen") sent a letter to Charles explaining that he was going to drop the charges against Plaintiff for lack of evidence, and he attached a memorandum which stated that Charles initiated the two criminal charges against Plaintiff. (ECF No. 344-2.) Olsen ultimately nolle prossed those criminal charges on January 27, 2023. (ECF No. 202-29 at 7–15.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of a party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact arises when the evidence is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly raised and supported, the opposing party bears the burden of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). In so doing, "the nonmoving party must rely on more than conclusory

allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50).

A district court may consider specific allegations in a party's pleadings if the party shows that he or she is competent to testify on the matters stated, verifies that those allegations are based on the party's personal knowledge, and shows that the allegations set out facts that would be admissible in evidence. *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *3 (E.D. Va. June 1, 2011) (citing Fed. R. Civ. P. 56(c)(4)), *aff'd*, 469 F. App'x 160 (4th Cir. 2012). Furthermore, if one party fails to properly address another party's assertion of fact, the court may consider that fact undisputed for purposes of a summary judgment motion. Fed. R. Civ. P. 56(e). Moreover, under Rule 56(c)(3), "The court need consider only the cited materials, but it may consider other materials in the record." As the Fourth Circuit has stated, a "court may decide a motion for summary judgment without undertaking an independent search of the record." *Arvon v. Liberty Mut. Fire Ins. Co.*, No. 20-1249, 2021 WL 3401258, at *3 (4th Cir. Aug. 4, 2021).

At the summary judgment stage, the Court views the facts presented by the evidence, and reasonable inferences therefrom, in the light most favorable to the nonmoving party. *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36

14

F.4th 240, 252 (4th Cir. 2022) (citing *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018)).

## III. ANALYSIS

### A. Defendants' Duplicitous Pleading Argument

Defendants Charles, Mari, Charles V. Hardenbergh, PC, CAMS, The Monroe Building, LLC, and 135 Monroe, LLC (collectively, the "Defendants") argue that Plaintiff's defamation claim (Count II in the First Amended Complaint) is duplicitous, constitutes misjoinder, and must be dismissed because it names nine (9) acts of defamation against six (6) different defendants.  (ECF No. 173 at 5.)[4]  Defendants argue that, based on *Federal Land Bank v. Birchfield*, 3 S.E.2d 405 (Va. 1939) and other Virginia state cases, it is improper for a plaintiff to assert separate acts of defamation in a single count.

The Fourth Circuit has unambiguously rejected the argument that the pleading standard described in *Birchfield* applies in federal court.  *Santos v. Christian*, No. 3:15CV476, 2015 WL 7738353, at *4 (E.D. Va. Nov. 30, 2015) (citing *Wuchenich v. Shenandoah Mem'l Hosp.*, 215 F.3d 1324, 2000 WL 665633, at *14 (4th Cir. 2000)). The Fourth Circuit has explained, "A defamation complaint, like any other civil complaint in federal court, must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2), sufficient to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

---

[4] The Court cites only one of the Defendants' briefs as the arguments from each Defendant are substantially similar.  (ECF No. 175 at 5; ECF No. 177 at 4, 13; ECF No. 179 at 5, 13; ECF No. 181 at 16; ECF No. 183 at 14–15.)

rests.'" *Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005).  Furthermore, under Rule 8(d)(2), a plaintiff "may set out two or more statements of a claim . . . either in a single count . . . or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."

Here, although one count in Plaintiff's First Amended Complaint alleges multiple acts of defamation against different Defendants, the document overall sufficiently explains which Defendants Plaintiff is attempting to hold liable for those acts.  Under "Count II Defamation," Plaintiff alleges in Paragraph 97 that the Hardenberghs are responsible for the defamatory Facebook statements described earlier in the First Amended Complaint, where the declarant for each statement is specifically alleged.  Then, in Paragraph 98, Plaintiff explains that the entities liable for the Sign are "the Hardenberghs and/or employees or agents of Charles V. Hardenbergh, PC, Commonwealth Attorney Marketing Service, LLC, The Monroe Building, LLC, and/or 135 Monroe, LLC."  (Am. Compl. at 22.)  While a jury may benefit from having these statements parsed out to clarify which defamatory statement was made by whom, these allegations in Plaintiff's First Amended Complaint do give the Defendants fair notice of Plaintiff's claims.  *See Hatfill*, 416 F.3d at 329.  For all these reasons, Defendants' "duplicitous" argument is not sufficient to grant them summary judgment in this case.

### B.  The Hardenberghs' Judicial Privilege Argument

The Hardenberghs argue that their statements about Plaintiff are privileged such that Plaintiff cannot use them to sue the Hardenberghs for defamation.  (ECF No. 177 at 12–13.)  The Hardenberghs explain that under Virginia law a person is immune from

defamation for statements made during a judicial proceeding. (*Id.* (citing *Watt v. McKelvie*, 248 S.E.2d 826 (Va. 1978)).) This judicial privilege can also apply, they argue, to defamatory statements made before a judicial proceeding is initiated. (*Id.* (citing *Collins v. Red Roof Inns, Inc.*, 248 F. Supp. 2d 512 (S.D. W. Va. 2003)).) The Hardenberghs contend that this privilege protects them from liability for the Sign and for statements they published online on Facebook.

Plaintiff acknowledges that this privilege exists under Virginia law, but argues that it does not extend to the Hardenberghs' conduct. (ECF No. 197 at 18 (citing *Mansfield v. Bernabei*, 727 S.E.2d 69 (Va. 2012)).) Plaintiff explains that the privilege only applies if the challenged statements were made solely to persons with an interest in the litigation, which is not the case here because the Hardenberghs made the statements in public— either on a large outdoor sign or to a wide audience online. (*Id.*) Plaintiff further argues that the Hardenberghs were not genuinely contemplating litigation when they made the online Facebook posts and when they displayed the Sign because they did not actually file their malicious prosecution claim until one year later. (*Id.*)

The Court finds that the judicial privilege described by the Hardenberghs does not extend to the statements they posted on Facebook or to the Sign that was displayed on the side of an office building. The Hardenberghs' arguments to the contrary are unpersuasive, and the cases they rely on are distinguishable. In *Watt*, the court applied the judicial privilege to statements made *during the course* of a judicial proceeding. 248 S.E.2d at 829. Similarly, in *Collins*, the privilege applied to correspondence *between the parties and their attorneys* about a prospective lawsuit. 248 F. Supp. 2d at 517 (finding

that the defendant "published the alleged defamatory statements solely to persons with interest in prospective judicial proceedings"). Those narrow circumstances are one thing, but it is something else entirely to publish statements to a wide audience online or to post a large sign by a public street. The Hardenberghs have not cited any authority showing that this privilege extends to the allegedly defamatory statements they made in public.

The Supreme Court of Virginia stated in *Watt* that the purpose of the privilege is to allow litigants "to *conduct the proceeding* with freedom to speak fully on the issues relating to the controversy." 248 S.E.2d at 829 (emphasis added). In other words, the privilege applies to statements made during judicial proceedings so that litigants and witnesses may testify freely at those proceedings. While this privilege may also apply to discussions between the parties before an action is filed or during settlement negotiations, it does not apply to the Sign or to the Hardenberghs' online Facebook statements. According to the evidence in the record, the Hardenberghs made their online statements to audiences on Facebook who have no formal interest in any of Charles' or Mari's judicial proceedings—past, present, or future. Likewise, the Court finds that the Sign was also published broadly to people with no interest in relevant judicial proceedings given that it was posted for weeks on the side of a building in front of a public street. In short, the Hardenberghs have failed to justify why they should be rendered privileged or immune from liability for this alleged defamation. Consequently, neither Charles nor Mari are entitled to summary judgment on these grounds.

18

## C. Defendants' Summary Judgment Motions on Defamation

In Virginia, the elements of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (2013)). To be actionable, the statement must not only be provably false, but also defamatory, "tend[ing] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (quoting Restatement (Second) of Torts § 559). Mere "rhetorical hyperbole" is not actionable. *Virginia Citizens Def. League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018) (quoting *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137 (Va. 1998)). "[D]efamatory words are those that make the plaintiff appear odious, infamous, or ridiculous." *Chapin*, 993 F.2d at 1092 (internal quotation marks omitted).

"[A] court must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Dalzell v. Arlington Cnty. Sheriff's Off.*, 646 F. Supp. 3d 731, 737 (E.D. Va. 2022) (quoting *Schaecher*, 772 S.E.2d at 595). This "reasonable capability" test recognizes that defamatory meaning is often implied. *Couric*, 910 F.3d at 784; *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009) ("Defamatory statements may include statements made by inference, implication, or insinuation.").

As the Court has previously explained in this case, it is well established that to state a person is a liar is actionable for defamation in certain contexts.

> The terms 'lie' and 'liar' are frequently used to characterize statements with which the speaker vehemently disagrees. If in

19

context the words mean that the defendant disapproves, it is a
protected epithet. *If it literally implies that the plaintiff made
a specific assertion or series of assertions knowing them to be
false, it may be actionable.*

*Edwards v. Schwartz*, 378 F. Supp. 3d 468, 525 (W.D. Va. 2019) (emphasis added)

(citing Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2.4.7

4th ed. 2010); Mem. Op., ECF No. 40 at 26–27.  When reviewing whether a statement is

actionable as defamation, the Court "must consider the statement as a whole." *Lewis v.
Kei*, 708 S.E.2d 884, 891 (Va. 2011).

Furthermore, it is well established that although libel is generally perpetrated by

written communications, it also includes defamation through the publishing of pictures or

photographs. *See, e.g., Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 786 (W.D. Va. 2014)

("A photograph can constitute a defamatory statement." (citing *Peck v. Trib. Co.*, 214

U.S. 185, 188 (1909))); *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 80 (W. Va.

1983); *see also White v. Nicholls*, 44 U.S. 266, 291 (1845) ("[E]very publication, either

by writing, printing, or *pictures*, which charges upon or imputes to any person that which

renders him liable to punishment, or which is calculated to make him infamous, or

odious, or ridiculous, is *prima facie* a libel, and implies malice in the author or publisher

towards the person concerning whom such publication is made." (emphasis added)).

As this Court has previously stated, someone who republishes or reproduces a

defamatory writing can be liable if they do so knowing the statement is false or inherently

improbable. *See League of United Latin Am. Citizens-Richmond Region Council 4614 v.
Pub. Interest Legal Found.*, No 1:18-cv-423, 2018 WL 3848404, at *1, 6–7 (E.D. Va.

Aug. 13, 2018).  "Repetition of another's words does not release one of responsibility if

the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted." *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969)).

In a defamation claim, a Plaintiff can recover compensatory damages for embarrassment, humiliation, mental suffering, and harm to her reputation and standing in the community. *Fleming v. Moore*, 275 S.E.2d 632, 639 (Va. 1981); *see Schnupp v. Smith*, 457 S.E.2d 42, 49–50 (Va. 1995). Furthermore, if the challenged words constitute defamation *per se*, then damages are presumed for the purposes of a summary judgment motion. *See Schaecher*, 772 S.E.2d at 598. Statements that are actionable *per se* include words that impute to a person the commission of a crime of moral turpitude, the unfitness to perform the duties of an office or employment of profit, the lack of integrity in the discharge of work duties, and words that otherwise prejudice a person in his or her profession or trade. *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 449 (Va. 2006) (citing *Fleming*, 275 S.E.2d at 635).

### i. Whether the Facebook Posts or the Sign are Defamatory

The Hardenberghs argue that Charles' and Mari's posts about Plaintiff on Facebook are not defamatory. (ECF No. 183 at 15–19.) Generally, they argue that the statements are true or are personal opinions, and they argue that some of the posts do not refer to Plaintiff. (*Id.*) In contrast, Plaintiff argues that each of the challenged Facebook posts constitute defamation against her. (ECF No. 197 at 19–25.)

Consistent with this Court's explanation in a previous Memorandum Opinion (Mem. Op., ECF No. 40 at 26–30), when reviewing the statements made on Facebook as a whole, in context, and given the manner in which the series was published, it is clear these posts were not simply matters of opinion.  Instead, the evidence indicates these posts were published with the intent to disparage Plaintiff by, *inter alia*, declaring that she "made a specific assertion or series of assertions knowing them to be false," making the posts actionable.  *Edwards*, 378 F. Supp. 3d at 525.  For example, Charles' Statement #1 equates Plaintiff Pam Hartnett with Pam Hupp, a woman convicted of murder, and it accuses Plaintiff of "lying" and committing "unthinkable crimes."  (Am. Compl. at 13.)  Building on that remark, Charles' Statement #2 is a reply to a short comment on Facebook in which Charles states that Plaintiff and Pam Hupp are both "accomplished liars who are completely self-centered, manipulative, and dangerous parasites."  (*Id.*)  Charles' Statement #3, reposted by Mari, implies Plaintiff is a "liar" and a "con artist" while advertising the Charles V. Hardenbergh, PC law firm.  (*Id.* at 13–14.) Charles' Statement #4 refers to Plaintiff as "a shameless liar who is fundamentally dishonest and treacherous" and claims that her and Pam Hupp "[b]oth commit violent crimes, claiming their victims are to blame" and that both were "Fired for Dishonesty." (*Id.* at 14.)  Charles' Statement #5 again equates Plaintiff with Pam Hupp and states, "Both Pams are courtroom veterans who have plotted and schemed to get money via fixed verdicts and shady claims."  (*Id.* at 15.)  Charles' Statement #6 accuses Plaintiff of fabricating criminal claims against the Hardenberghs and calls Plaintiff a "liar" who is

executing a "long con", committing "frauds," and trying to frame innocent people. (*Id.* at 16.)

Charles' and Mari's statements here are not mere expressions of opinion or exasperation over a public figure or public debate. *See Edwards*, 378 F. Supp. 3d at 505. Rather, the statements strike a deeply personal tone, repeatedly targeting Plaintiff's core character traits—particularly her integrity. Furthermore, these statements make assertions that can be proven true or false at trial. *See Cashion v. Smith*, 749 S.E.2d 526, 531 (2013). For example, these include the claims that Plaintiff committed violent crimes, that she blamed her victims for those crimes, that she committed fraudulent actions, that she was fired by her employer for dishonesty and embezzling, and that she "plotted and schemed to get money via fixed verdicts and shady claims." Overall, the statements contain a collection of concrete accusations of particular acts performed by Plaintiff and assertions that her character is fundamentally dishonest. Moreover, as Charles admitted in his testimony, these public statements were calculated to bait Plaintiff into reacting. (ECF No. 202-29 at 13–30.) Consequently, the Court finds that the Facebook posts by Charles and Mari are reasonably capable of defamatory meaning. *See Dalzell*, 646 F. Supp. 3d at 737 (quoting *Schaecher*, 772 S.E.2d at 595).

The Sign exhibited in large, red, capital letters the words "REGISTERED SEX OFFENDERS," "EXTORTIONISTS," "LIARS," and "VIOLENCE" around four pictures that collectively feature Plaintiff, her family, and her counsel. Plaintiff herself appears in the picture below "REGISTERED SEX OFFENDERS" and in the picture that contains the word "LIARS." It is not clear that the words used are limited to any one

picture, particularly given that the plural word "LIARS" is displayed on top of a picture of just one person, the Plaintiff.  Thus, viewing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that the phrases on the Sign that describe Plaintiff are not limited to the word "LIARS."  Furthermore, the Sign gives each of the statements—including the word "LIARS"—the patina of legal significance given the surrounding content that describes criminal acts and advertises legal services.  (ECF No. 9-11.)  In addition, the Sign was displayed on the side of a law firm's office building by a public street for weeks and Charles acknowledged that he intended for the Sign to provoke a reaction by Plaintiff when she drove by.  (ECF No. 202-29 at 13–30; Charles' Dep. at 50–51, 61–62.)  For all these reasons, given the context of the Sign as a whole, the statements on the Sign are reasonably capable of defamatory meaning.  *See Dalzell*, 646 F. Supp. 3d at 737 (quoting *Schaecher*, 772 S.E.2d at 595).

Here, the evidence suggests that the Defendants' actions caused Plaintiff's reputation to be harmed, that she was compelled to move her permanent residence from her lifelong home in Petersburg to North Carolina, and that she suffered observable mental health damage that required psychiatric care.  (*See* Pl.'s First Dep. at 2, 13, 27; ECF No. 202-15 at 7).  The Hardenberghs will certainly have the opportunity at trial to present evidence contesting these claims or to show that their statements about Plaintiff are true.  However, at this stage, the Court finds that the defamation evidence produced by Plaintiff is sufficient to survive a motion for summary judgment.  *See Dalzell*, 646 F. Supp. 3d at 737.

### ii. Whether any Defendants are Liable for the Sign

Regardless of whether the Sign is defamatory, Defendants argue, Plaintiff has not established who posted the Sign on the building at 139 Monroe Street, and therefore no reasonable jury could find any of the Defendants liable. (ECF No. 183 at 19.)  Plaintiff counters that sufficient evidence in the record ties each Defendant to the defamatory Sign. (ECF No. 197 at 25–27).  The Court reviews each Defendant's liability in turn.

### a.  Relevant Legal Rules

A corporation can be held liable for torts committed by its officers or agents under certain circumstances, such as when the corporation directs or ratifies the conduct. *Parker v. Carilion Clinic*, 819 S.E.2d 809, 819–24, n.12 (Va. 2018).  Likewise, a Virginia limited liability company ("LLC") can be held liable for an act committed by one of its members if that act was "for apparently carrying on in the ordinary course the limited liability company business or business of the kind carried on by the limited liability company." *See Orthopedic & Sports Physical Therapy Assocs., Inc. v. Summit Grp. Properties, LLC*, 724 S.E.2d 718, 720–23 (Va. 2012) (quoting Virginia Code § 13.1-1021.1(A)(2)).

Jurisdictions outside Virginia have found that a property owner is liable for the continued publication of defamatory material if he learns that it is exhibited on property under his control, but he intentionally and unreasonably fails to remove it. *See Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1016–17 (Fla. 2001); *Tidmore v. Mills*, 32 So. 2d 769, 777–78 (Ala. Ct. App. 1947).  While Virginia has not clearly adopted this principle, the Fourth Circuit has predicted that the Supreme Court of Virginia is likely to do so.

25

*Daniels v. Ga.-Pac. Corp.*, 162 F.3d 1154 (4th Cir. Aug. 25, 1998) (per curiam); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997) (stating that failure to remove a defamatory statement by a third party is, itself, a publication of the statement). In fact, the Fourth Circuit in *Daniels* found that a cause of action for defamation began to accrue against a Virginia property owner after it was notified of defamatory graffiti on its property and the owner did not remove it.  162 F.3d 1154 (per curiam).

### b.  Charles' Liability for the Sign

Plaintiff has provided more than enough evidence to show that Charles was responsible for creating and displaying the Sign.  Charles admitted that he "was involved in the drafting, designing, creating, and printing the sign." (ECF No. 202-31 at 15.)  He also testified that he wanted the Sign visible from the road so that Plaintiff would see it when she drove by the building and then be prompted to react.  (Charles' Dep. at 61.)  Although Charles stated that he did not know who actually installed the Sign, a reasonable factfinder could readily infer that Charles either installed the Sign himself or had one of his employees or agents do it for him.  After all, Charles was involved in the Sign's creation, he wanted it displayed, he knew it was displayed for weeks, and it was displayed on a building that his LLC owns and that houses his businesses.

### c.  Charles V. Hardenbergh, PC's Liability for the Sign

Charles is an officer of the Law Firm, Charles V. Hardenbergh, PC.  (Charles' Dep. at 7.)  Evidence in the record is sufficient for a reasonable factfinder to conclude that Charles published the Sign.  The evidence further shows that Charles published the Sign for the benefit of the Law Firm, at least in part, given that (1) the Sign declares itself

to be for "THE LAW OFFICES OF CHARLES V. HARDENBERGH" and given that (2) the Sign asks viewers to call the Law Firm's number to respond to the Sign's advertisement of legal services. (ECF No. 9-11.)  The Sign was installed outside the Law Firm's offices, but no evidence in the record shows that any employee or agent attempted to remove the Sign until it had been displayed for weeks.  For all these reasons, the Law Firm can be held liable for publishing the Sign and is therefore not entitled to summary judgment. *See Parker*, 819 S.E.2d at 819–24; *Summit Grp.* 724 S.E.2d at 720–23.

### d. The Monroe Building, LLC's Liability for the Sign

Two sets of facts indicate The Monroe Building, LLC is responsible for publishing the defamatory Sign.  First, one of its members—the Law Firm—is responsible for publishing the Sign, and the Sign was published, in part, for carrying on The Monroe Building, LLC's business of leasing space in its building.  (ECF Nos. 202-8, 202-9); *see* Virginia Code § 13.1-1021.1(A)(2).  Specifically, The Monroe Building, LLC owns the 139 Monroe Street building, and the Sign advertises space for rent there.  (Charles' Dep. 28, 64.)  Second, The Monroe Building, LLC is independently liable for publishing the Sign because it left the defamatory Sign displayed on its wall in front of a public city street for weeks without covering it or removing it.  *See Zeran*, 129 F.3d at 332 (4th Cir. 1997) (citing Restatement (Second) of Torts § 577).  Consequently, The Monroe Building, LLC is also not entitled to summary judgment here.

### e. CAMS's Liability for the Sign

CAMS argues that Plaintiff has produced no evidence that any CAMS employee created, printed, or displayed the Sign. (ECF No. 179 at 12–13.)  In response, Plaintiff

argues that Charles was the one who organized CAMS (an LLC), that Charles still runs CAMS, and that jurors could infer that CAMS manufactured the Sign because CAMS produces legal advertising posters that are similar to the Sign. (ECF No. 200 at 4–6, 16–18.)

Under Plaintiff's theory, a jury would have to rely on circumstantial evidence to conclude that CAMS manufactured the Sign. The Court finds, when taking the evidence in the record in the light most favorable to Plaintiff, that a reasonable juror could make that inferential leap. However, Plaintiff fails to explain why printing the Sign is sufficient to hold CAMS liable for defamation. Plaintiff does not provide any Virginia authority that lays a duty on a print shop to refuse printing defamatory material that a customer orders. In addition, Plaintiff cannot rely on a property owner or manager theory of liability because CAMS does not own 139 Monroe Street and CAMS is not the only business that occupies that building. Therefore, Plaintiff has failed to demonstrate a legal basis to hold CAMS liable based on the facts in the record. Consequently, CAMS's Motion for Summary Judgment (ECF No. 178) will be granted.

### f. 135 Monroe, LLC's Liability for the Sign

135 Monroe, LLC argues that no evidence shows that it was involved in creating or displaying the Sign. (ECF No. 173 at 10.) In response, Plaintiff argues that although the Sign was hung on *139 Monroe Street*, the Sign actually advertised space to rent at *135 Monroe Street*. (ECF No. 202 at 11–19.) Specifically, Plaintiff claims that the portion of the Sign which reads, "TO RENT THIS SPACE," refers to 135 Monroe Street. (*Id.*) This is so, Plaintiff explains, because 135 Monroe Street was vacant and available

to rent, while 139 Monroe Street had no space available. (*Id.*) The evidence that Plaintiff appears to cite to support this claim is her Affidavit dated May 20, 2024 (ECF No. 202-26 at 2). In the Affidavit, Plaintiff asserts that she had personal knowledge that between 2016 and July 20, 2019, no space at 139 Monroe Street was available for rent to the public. (*Id.*)

While Plaintiff claims she had personal knowledge of leasing arrangements at 139 Monroe Street up to July 2019, that information was subject to change by the time the Sign was first displayed in March and April 2022. The Fourth Circuit has explained that "summary judgment affidavits cannot be conclusory," rather, "Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). At best, Plaintiff has personal knowledge that almost three years before the Sign was displayed no space was available for rent at 139 Monroe Street. In addition, she fails to point to affirmative evidence that the Sign referred to any building other than the one where it was displayed, namely, 139 Monroe Street. In sum, Plaintiff's assertion about what space is advertised for rent by the Sign amounts to nothing more than a conclusory allegation, which is not enough to resist summary judgment. *See Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020); *Anderson*, 477 U.S. at 252. Consequently, even if one of the members or agents of 135 Monroe, LLC created the Sign and installed it on the building at 139 Monroe Street, Plaintiff has not shown that those actions were ordered or ratified by the company, or that they were otherwise carried out to benefit 135 Monroe, LLC's

29

business. *See Summit Grp.*, 724 S.E.2d at 720 (quoting Virginia Code § 13.1-1021.1(A)(2)). For all these reasons, 135 Monroe, LLC's Motion for Summary Judgment (ECF No. 172) will be granted.

### g. Mari's Liability for the Sign

Mari argues that Plaintiff has failed to identify any factual basis to hold Mari responsible for the Sign. (ECF No. 177 at 2, 17.) In response, Plaintiff argues that Mari is liable for the defamatory Sign because she knew about it for weeks and failed to remove it. (ECF No. 198 at 23–24). Indeed, Mari was aware of the Sign on the building at 139 Monroe Street during the weeks it was displayed. (Mari's Dep. at 53; ECF No. 202-28 at 17.) Mari is the Chief Operating Officer of the Law Firm, the Law Firm organized The Monroe Building, LLC which owns the building on which the Sign was displayed, and Mari testified that she is responsible for managing that same building. (Mari's Dep. at 6–7.) The evidence is certainly sufficient to conclude that Mari had some proprietary interest in the building at 139 Monroe Street, and that the building was within her custody or control when the Sign was displayed.

Given her position within these entities, her control over the building, her professional relationship to Charles, and the lack of action on her part after the Sign was installed on her building, a reasonable juror could conclude that Mari had knowledge of the defamatory Sign before it was displayed. Furthermore, Mari left that defamatory Sign in public view for weeks on a building she manages and controls, and no evidence in the record shows that she attempted to censor or remove it during that timeframe. In

short, Mari has not persuaded the Court that she is entitled to summary judgment as to

her liability for the Sign. *See Daniels*, 162 F.3d at 1154; *Zeran*, 129 F.3d at 332.

### D. Charles' Motion for Summary Judgment on Negligence

In Count III of her Amended Complaint, Plaintiff alleges that the Hardenberghs

are liable for negligence because they physically beat and injured her, left her at her home

while she was injured, confined her for five (5) days, and failed to provide her medical

treatment. (Am. Compl. at 23–25.) The Hardenberghs argue that Plaintiff cannot sue

them for both battery and negligence for the same act. (ECF No. 171 at 4–6.) In

addition, the Hardenberghs contend that a batterer does not owe the victim a standard of

care after a battery. (*Id.*) In contrast, Plaintiff contends that she can plead both battery

and negligence in the alternative. (ECF No. 197 at 15–17 (citing *Infant C. v. Boy Scouts

of America, Inc.*, 391 S.E. 2d 322 (Va. 1990)).) Plaintiff states that because the

Hardenberghs will claim at trial that their actions were not intentional, she wants to

maintain both her battery and negligence claims in the case at this stage. (*Id.*)

"General negligence principles require a person to exercise due care to avoid

injuring others." *RGR, LLC v. Settle*, 764 S.E.2d 8, 16 (Va. 2014) (citing *Overstreet v.

Security Storage & Safe Deposit Co.*, 138 S.E. 552, 555 (Va. 1927)). An actor owes a

duty of care to prevent injury to others from risks of physical harm that the actor creates

or maintains. *See id.* Furthermore, under Federal Rule of Civil Procedure 8, a plaintiff

can raise claims for both battery and negligence in the same pleading.

Here, Plaintiff has testified that Charles intentionally attacked and beat her in the

limousine and in her home with Mari's assistance. (Pl.'s First Dep. at 27–36.) Both

31

Charles and Mari deny that either of them attacked her, instead explaining that Plaintiff was the aggressor and that she hurt herself and fell down at one point due to the limousine's brakes. (ECF No. 202-6 at 146–50; ECF No. 202-28 at 4–6; ECF No. 202-31 at 5–8.) The truth of what occurred in the limousine and in Plaintiff's home is certainly in dispute. In addition to the self-interested and contradictory testimony from the parties, Plaintiff has presented photographic evidence of her injuries, and text messages between herself and Charles that could corroborate either a claim of battery or negligence. (ECF Nos. 9-2, 9-5, 9-6.) Based on all this evidence and the testimony from both parties about the amount of alcohol consumed that night, a reasonable juror could conclude that something less than battery occurred in the limousine and Plaintiff's home, but that the actions by Charles or Mari nonetheless created a risk that resulted in unintentional injury to Plaintiff. *See Settle*, 764 S.E.2d at 16. In other words, the facts that would support a finding of battery or negligence by the jury here are so much in dispute that the Hardenberghs are not entitled to summary judgment on Plaintiff's negligence claim.

### E. The Hardenberghs' Motions for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claims

To prevail in a malicious prosecution action, a plaintiff must prove by a preponderance of the evidence that "the prosecution was (1) malicious, (2) instituted by or with the cooperation of the [defendant], (3) without probable cause, and (4) terminated in a manner not unfavorable to [the plaintiff]." *O'Connor v. Tice*, 704 S.E.2d 572, 575 (Va. 2011) (citing *Reilly v. Shepherd*, 643 S.E.2d 216, 218 (Va. 2007)). "[M]alice is

32

defined as any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998). Malice can be inferred from "a history of animosity between the parties." *Dill v. Kroger Ltd. P'ship I*, 860 S.E.2d 372, 380 (Va. 2021). "[I]n malicious prosecutions stemming from civil proceedings the plaintiff must allege and prove arrest of his person, seizure of his property or special injury incurred." *Ayyildiz v. Kidd*, 266 S.E.2d 108, 111 (Va. 1980).

Plaintiff's claim for malicious prosecution is based on a protective order Charles sought against Plaintiff, and also on criminal complaints that Plaintiff asserts the Hardenberghs filed in Chesterfield County regarding trespassing and conspiracy to injure business reputation. (ECF No. 202-29 at 7–15; ECF No. 202-32 at 1–2; Am. Compl. at 26–28.)

Charles argues that even if he was the one who obtained the criminal charges and protective order against Plaintiff, there is little evidence in the record that Charles sought those charges with malice. (ECF No. 342 at 4–8.) In addition, Charles argues that because a magistrate signed the criminal warrants, there is presumption that the charges were supported by probable cause. (*Id.* citing *Evans v. Michaelson*, 135 S.E. 683, 685 (Va. 1926)). In response, Plaintiff contends that Charles' malice was obvious, that he did not tell the magistrate the full story when he sought the criminal warrants, and that he raised bald allegations to the magistrate that were not supported by any facts or evidence. (ECF No. 344 at 5, 19.) Plaintiff also points out that the prosecutors ultimately elected to drop the charges against Plaintiff due to the lack of evidence. (*Id.* at 20.)

The facts in the record demonstrate that Plaintiff and the Hardenberghs had a history of animosity by the time the criminal charges against Plaintiff were sought. *See Dill*, 860 S.E.2d at 380 (holding that malice can be inferred from "a history of animosity between the parties"). A reasonable juror could conclude that this history was the impetus for the criminal charges against Plaintiff. Furthermore, Plaintiff's claim that Charles is the one who initiated the criminal charges is well supported by Special Prosecutor Olsen's letter and the attached memorandum. (ECF No. 344-2.) Charles' testimony and the text of the criminal complaints further support this claim, but also muddy the waters by indicating that Mari may have cooperated in initiating and advancing those charges as well. (ECF No. 202-3 at 270–71; ECF No. 202-29 at 7–15; ECF No. 202-32 at 1–2). On probable cause, whether Plaintiff actually committed the deeds alleged in the criminal complaints (or at least whether Charles or Mari had some grounds to believe that she did) comes down to whether Plaintiff's or the Hardenberghs' account is truthful, which puts those underlying facts in genuine dispute. In addition, Special Prosecutor Olsen's documented decision to nolle prosequi the charges for lack of evidence lends no support to Charles' defense that there was probable cause to seek the charges. (ECF No. 344-2 at 3–4.) Under these circumstances, a reasonable juror could conclude that Charles and Mari pursued the criminal complaints against Plaintiff with malice, without probable cause, and that the result was not unfavorable to Plaintiff. Although Plaintiff must allege a special injury in her claim based on Charles' protective order, Plaintiff's injury is wrapped up in her other alleged damages in this case, such as the fact that after Charles petitioned for the protective order, Plaintiff had to move her

34

residence across state lines, away from her lifelong home. *See also Ayyildiz*, 266 S.E.2d at 111. Therefore, Charles' and Mari's motions for summary judgment as to Plaintiff's malicious prosecution claim will be denied.

### F. Plaintiff's Motion for Summary Judgment on Malicious Prosecution

Because the Plaintiff is the movant for this summary judgment motion, the Court must view the facts in the light most favorable to the Hardenberghs, the non-movants. *See 8.929 Acres of Land*, 36 F.4th at 252 (citing *Carter*, 879 F.3d at 139).

Plaintiff requests that the Court enter summary judgment against the Hardenberghs on their malicious prosecution counterclaims. (ECF No. 303.) These counterclaims are based on the six separate criminal charges Plaintiff initiated against the Hardenberghs between July 25, 2019 and January 8, 2020. (Counter-Complaint at 35–43, ECF No. 44.) Plaintiff argues that the rule from *Orndorff v. Bond*, 39 S.E.2d 352 (1946) applies here. That rule prohibits a malicious prosecution claim if the criminal defendant made a compromise with the government that resulted in a *nolle prosequi* of the charge. In Plaintiff's view, because the prosecutor nolle prossed two of the criminal charges here pursuant to a voluntary agreement between the government and the Hardenberghs, the Hardenberghs' malicious prosecution claims must fail as a matter of law. (ECF No. 304 at 6–7 (citing *Orndorff*, 39 S.E.2d 352).) Specifically, Plaintiff argues the Hardenberghs "voluntarily compromised, agreed and [met] all the conditional terms of the Special Prosecutor's December 10, 2021 email" which required that they take anger management classes and pay the DCJS for injuries Plaintiff suffered. (ECF No. 377.) Even though the agreement Plaintiff relies on only resolved the two charges initiated on January 8, 2020

(the "January 8 Charges"), Plaintiff contends that the *Orndorff* rule should apply to all six

of the underlying criminal charges because all of these charges are related, and because

they were each brought by Special Prosecutor Newman. (*Id.* at 3.)

The Hardenberghs argue that the *Orndoff* rule does not apply here because the

accuser—Plaintiff—did not consent to the agreed disposition of those two charges. (ECF

No. 314 at 3–8.) In addition, the Hardenberghs explain that there was no agreement at all

as to four of the six charges Plaintiff brought against Defendants. (*Id.*) Finally, they

argue that the cases Plaintiff cites are distinguishable. (ECF No. 378 at 1–7.)

Over 50 years after *Orndorff* was decided, the Supreme Court of Virginia affirmed

the *Orndorff* rule in *Andrews v. Ring*, 266 Va. 311, 325 (2003) (citing *Orndorff v. Bond* at

502). In so doing, that court stated, "A voluntary compromise ending a criminal

prosecution defeats a subsequent suit for malicious prosecution." *Id.* Likewise, in

*Bennett v. R & L Carriers Shared Servs., LLC*, the Fourth Circuit described the *Orndorff*

rule as one that applies when there is an agreement between the government and

defendant. 492 F. App'x 315, 333 (4th Cir. 2012). In those decisions, the Supreme Court

of Virginia and the Fourth Circuit did not require the malicious prosecution plaintiff to

have consented to dismissing the underlying charge. *Id*; *Andrews*, 266 Va. at 325.

Here, the Hardenberghs have failed to raise a genuine dispute as to the principal

fact at issue: that the two January 8 Charges against them were dismissed due to a

compromise agreement between them and the government that required them to undergo

anger management classes and pay a victim fund. Although Plaintiff opposed this

agreement, the Court finds that her consent was not required for the *Orndorff* rule to

36

apply in this case. Recent caselaw does not list such consent as a requirement. *See Andrews*, 266 Va. at 325; *Bennett*, 492 F. App'x at 333. Therefore, because the Hardenberghs entered a voluntary compromise with the government to dismiss two criminal charges against them—an agreement that required them to take some unfavorable actions they would not otherwise pursue—the rule from *Orndorff* precludes the Hardenberghs from bringing a malicious prosecution claim against Plaintiff for the charges subject to that agreement. *See Bennett*, 492 F. App'x at 333 (citing *Orndorff*, 39 S.E.2d 352).

However, the only charges subject to a compromise agreement in this case were the two January 8 Charges. (ECF No. 202-22). The Hardenberghs base the remainder of their malicious prosecution claim on four other criminal charges that had already been nolle prossed when the Hardenberghs made their compromise agreement with the government. The Court finds that the agreement about the January 8 Charges cannot be applied to criminal charges that had already been nolle prossed years earlier. Although all six charges are similar and were pursued by the same prosecutor, the first four charges are simply not part of an agreement that did not begin to exist until after those four charges were nolle prossed. Consequently, the Court will grant Plaintiff's summary judgment motion (ECF No. 303) as to the two criminal charges initiated on January 8, 2020. The Court will deny the motion as to the four other criminal charges upon which the Hardenberghs base their malicious prosecution claim.

## IV. CONCLUSION

For all these reasons, the Motions for Summary Judgment by CAMS (ECF No. 178) and 135 Monroe, LLC (ECF No. 172) will be granted.  Plaintiff's Motion for Partial Summary Judgment (ECF No. 303) will be granted as to the two January 8 Charges, but it will be denied as to the four other criminal charges.  The Motions for Summary Judgment by Charles (ECF Nos. 170, 182, 341), Mari (ECF Nos. 176, 339), The Monroe Building, LLC (ECF No. 174), and Charles V. Hardenbergh, PC (ECF No. 180) will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: January 24, 2025
Richmond, Virginia